**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

RECEIVED

2025 JUN 11  A 9: 37

_____ ___ER, CLK
U.S. ___ICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| **REAR ADMIRAL W. KENT**<br>**DAVIS (RET.),** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No:**  2:25-cv-429-MHT-SMD |
| **KAY E. IVEY, in her individual capacity,** | ) | |
| **and in her official capacity as** | ) | |
| **GOVERNOR OF THE STATE OF** | ) | |
| **ALABAMA,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Rear Admiral W. Kent Davis (Ret.) brings this complaint against Defendant Kay E. Ivey, in her official capacity and in her personal and individual capacity to assert claims under 42 U.S.C. § 1983 and § 1985 to redress the deprivation, under color of state law, of rights guaranteed to Davis by the Constitution of the United States for Ivey knowingly violating clearly established First and Fourteenth Amendment rights. Davis also brings claims under the common and statutory laws of the State of Alabama.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this cause of action pursuant 28 U.S.C. §§ 1331 and 1343(a)(3).

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that Plaintiff is domiciled and resides in this judicial district and division, Defendant is domiciled and resides in this judicial

district and division, and the events made the basis of this suit all took place in this judicial district and division.

## PARTIES

3.      Plaintiff, Rear Admiral Kent Davis ("Plaintiff" or "Davis"), is over the age of 19 and is a resident of Montgomery, Alabama.  At all times material herein, he was a retired U.S. Navy Rear Admiral serving as Commissioner of the Alabama Department of Veterans Affairs (ADVA).

4.      Defendant, Kay E. Ivey, is over the age of 19 and is a resident of Montgomery, Alabama. At all times material herein, she was Governor of the State of Alabama. She is being sued in her individual capacity and her official capacity as the Governor of the State of Alabama.

## STATEMENT OF FACTS

5.      In 1945, the Alabama Legislature created the State Department of Veterans' Affairs, to operate under a State Board of Veterans' Affairs ("SBVA") to be headed by a State Service Commissioner. *Code of Alabama* § 31-5-2.

6.      During the events made the basis of this suit, members of the SBVA consisted of the Governor as chair and representatives who are to be selected from the memberships of the Alabama Department of the American Legion, the Veterans of Foreign Wars, the Disabled American Veterans, the Vietnam Veterans of America, AMVETS, the Military Order of the Purple Heart, the American Ex-Prisoners of War, Inc., the Alabama Alliance of the Military Officers Association of America, Inc., and the Marine Corps League, *Code of Alabama* § 31-5-3.

7.      *Code of Alabama* § 31-5-6 provided, in pertinent part, that "[i]t shall be the duty of the State Board of Veterans' Affairs to appoint a State Service Commissioner who shall serve for a term of four years subject to removal by the State Board for cause...." Thus, the Commissioner was appointed by the Board and could only be removed by the Board and only "for cause."

8.     On February 19, 2019, Davis became the seventh Commissioner of the Alabama Department of Veteran's Affairs ("ADVA") upon his appointment by the SBVA. In late 2022, the SBVA voted and unanimously reappointed Davis to a second four-year term that began in February 2023. As a matter of law, Davis was not appointed nor hired by Ivey and did not serve at Ivey's pleasure.

9.     In November 2022, the ADVA received $5 million in American Rescue Plan Act ("ARPA") funds to address veterans mental health needs in its State Veterans Homes. A Memorandum of Understanding was reached between the ADVA and the Alabama Department of Finance.

10.    In June 2023, the Alabama Department of Finance approached the ADVA regarding an additional $2 million in funds available for veterans' mental health. It was determined that the original $5 million in ARPA funds were not best utilized in the State Veterans Homes and that the funds would be best used elsewhere. After consulting with the Alabama Department of Finance, it was decided that the funds would be used for creating a grant program of $7 million to assist Alabama veterans' mental health needs.

11.    In July 2023, the SBVA voted and approved the use of $7 million for a veterans' mental health grant program using its previously approved Grant Special Committee-devised procedures. The Alabama Department of Mental Health ("ADMH") advised using a Request for Proposals (RFP) process and identified staff willing to serve on a rating panel and assist as subject matter experts for development of the RFP. They also indicated they were open to the idea of administering the grants but required additional information. The ADMH suggested an interagency agreement once the final decision was made.

12.    In August 2023, the ADVA entered an agreement with the Alabama Department of Finance to use the $7 million funds to support the mental health needs of Alabama Veterans and their family

3

members through grant opportunities. The agreement defined mental health programs as "programs and services that improve the social, emotional and/or psychological well-being of Veterans and/or their families." (Memorandum of Understanding.)

13.     In October 2023, the ADVA, by direction of the SBVA, announced the grant program via a news release on October 5, 2023. The grant was promoted as a one-time funding of up to $500,000 for programs and services designed to positively impact the mental health of Alabama Veterans and their families. The goal was to provide accessible and quality support to those who have served our nation, veterans and their families. As posted, special consideration was to be provided to smaller organizations and to those targeting the underserved sectors of this population. The RFP was posted on both ADVA and ADMH websites.

14.     The ADVA signed a Memorandum of Agreement (MOA) with the ADMH for assistance in administering the grant based on its experience, expertise, and knowledge of administering grant programs with ARPA funds.  Those administrative duties involved writing contracts for the grant recipients and distributing the funds. The ADMH was to be paid a set sum for those services from the grant funds. With this agreement formed and partnership established, the scoring panel of grant proposals consisted of three senior employees of the ADMH and two prominent Alabama Veterans, who are unaffiliated with the ADVA or the SBVA. The ADVA-ADMH MOA included these provisions:

A. TERMINATION OF AGREEEMENT

Except as set forth in this section, this Agreement may be terminated by either party for any reason with sixty days' written notice to either party and the return of any unspent funds.

B. MISCELLANEOUS PROVISIONS

In the event of any dispute between the parties, senior officials of both parties shall meet and engage in a good faith attempt to resolve the dispute. Should that effort fail, and the dispute involve the payment of money, the sole remedy is the filing of a claim with the Board of Adjustment of the State of Alabama. For any and all other

4

disputes arising under the terms of this Agreement which are not resolved by negotiation, the parties agree to utilize appropriate forms of non-binding alternative dispute resolution, including, but not limited to, mediation. Such dispute resolution shall occur in Montgomery, Alabama, utilizing, where appropriate, mediators selected from the roster of mediators maintained by the Center for Dispute Resolution of the Alabama State Bar.

15. Pursuant to the grant requirements, the SBVA was solely responsible for selecting grant recipients. Upon notification of the selectees made by the SBVA, the ADVA then notified the awardees of their selection. Davis was not involved in the substantive selection process and specifically recused himself from reviewing grant proposals in order to avoid any appearance of favoritism.

16. The ADVA regularly communicated, worked, and met with representatives of the ADMH during the following months to discuss the grant program.

17. The SBVA special grant committee met on January 10, 2024, to discuss the intent of the grant and, based on discussion and a recommendation by SBVA Vice Chair Scott Gedling, decided to expand the number of recipients to better meet the SBVA's intent regarding the grant. To increase the diversity and better meet the intent of the SBVA, the committee recommended expanding the list of recipients to accommodate the expansion and awarding 50% of the proposed requests, resulting in 33 grant recipients. The full SBVA adopted the recommendations of the committee the following day. No changes to the scorings or rankings were done.

18. In March 2024, the ADVA transferred $7 million in ARPA funds to the ADMH to administer the grants to the grant program recipients.

19. On April 2, 2024, Commissioner Davis hosted ADVA Deputy Attorney General Beverly Gebhardt, SBVA Vice Chairman Scott Gedling, SBVA Legislative Committee Chairman Tony Berenotto, ADMH Commissioner Kim Boswell, ADMH Chief of Staff Collier Tynes, Executive Director of the Alabama Council for Behavioral Healthcare Holly McCorkle, and VFW State

Commander Danny Sample at the ADVA headquarters for the Alabama Council for Behavioral Healthcare to brief the group on Veterans-tailored mental health programs offered by their members.

20.    Unbeknownst to Davis at the time, the expansion of recipients upset the ADMH Commissioner Kim Boswell as it would result in much more work for her department under the MOA and included some grant recipients that she did not respect. Also unbeknownst to Davis, Commissioner Boswell became upset with John Kilpatrick, an SBVA member and official affiliated with two potential grant recipients, who had recused himself and abstained from any deliberations and votes by the SBVA on grant recipients.

21.    Rather than follow the dispute resolution process required by the ADVA-ADMH MOA, directly following the April 2 meeting, Commissioner Boswell presented Commissioner Davis with a termination letter of the MOA with Gebhardt present. The ADMH never had made any indication of any issues or concern with the grant program prior to the termination letter, including during the April 2 meeting. Also, unbeknownst to the ADVA, Commissioner Boswell sent a copy of the termination letter listing serious but false allegations to the Alabama Department of Finance.

22.    Following the termination of the MOA, the ADMH returned the $7 million of ARPA funds to the ADVA. The ADVA then was left without a grant administrator and the ability to provide funds to the selected grant recipients.  In order to save the program and fulfill the SBVA's and the ADVA's obligations to the grant recipients, Davis immediately began looking for an alternate solution to provide grant funds to the intended veterans' mental health programs.

23.    Davis was aware that Troy University had its own grant program which provided the expertise and capability to administer sizeable grants for the purpose of grant administration.

6

Therefore, Davis contacted Troy University and it agreed to serve as the grant administrator. Troy and the ADVA entered into an MOA.

24.    Davis then obtained permission from the SBVA to use Veterans Assistance Fund money as an alternate source of funding in the event that the delay caused by the ADMH breaking the MOA made it impossible for the new grant administrator to meet a deadline of June 1, 2024, which was required by ARPA regulations to execute the contracts for ARPA funds.

25.    Simultaneous to Davis's efforts to salvage the grant process for veterans' mental health programs, the Alabama Department of Finance was investigating and responding to Commissioner Boswell's allegations regarding the ARPA funds. The Alabama Department of Finance issued a cease-and-desist order to the ADVA for all grant activities, including any communications with prospective grant recipients, while the investigation was ongoing. Davis and the ADVA complied with this order, which resulted in a further delay of several weeks to the grant administration process.

26.    In May 2024, the Alabama State Legislature, at the request of the ADVA, appropriated funds through Senate Bill 66 to authorize the ADVA to utilize Veterans Assistance Fund dollars as an alternate option for funding the grant program. SB66, making a supplemental appropriation for Fiscal Year 2024, received final legislative passage on May 8. It became a law when signed by Governor Ivey on May 17, 2024, making it Act 2024- 412.

27.    At a special-called meeting on May 9, the SBVA authorized the ADVA to utilize funds from the Veterans Assistance Fund for the grant program if the SBVA Vice Chairman determined the ARPA funds were not reasonably executable.

28.    With the critical June 1, 2024, ARPA deadline looming, the ADVA continued working with the Alabama Department of Finance. Commissioner Davis spoke with Finance Director Bill Poole

by phone on May 21, 2024, to discuss the investigation. Director Poole apologized for the delayed response and noted that after the Alabama Department of Finance gave the program a deep look, it found that no conflicts of interest took place during the grant selection process, that the grant procedures used were good, and gave the ADVA the green light to continue their vital grant work. Director Poole also commended Commissioner Davis for finding alternate funding for the grant program. The decision was made at this time between Director Poole and Commissioner Davis that the ADVA was unfortunately unable to utilize the ARPA funds for the grant program due to time restraints and the intricacies of the ARPA regulations. The Alabama Department of Finance thus terminated its agreement with the ADVA and the full $7 million in ARPA funds were transferred back to the Alabama Department of Finance for full use by another state agency.

29.     The grant program was able to move forward at that time using the alternate funding from the Veterans Assistance Fund with Troy University as the administrator.  This was largely possible due to the resourcefulness and expertise of Commissioner Davis who was determined not to fail the veterans' mental health programs who had qualified for grants.

30.     On July 9, 2024, before a quarterly meeting of the SBVA in Enterprise, Alabama, Commissioner Davis was approached by SBVA members Mr. Tony Berenotto and Mr. John Kilpatrick and was quickly joined by SBVA Vice Chair Mr. Scott Gedling.  Those three members expressed to Commissioner Davis what they characterized as ethics concerns surrounding the actions of various external parties, including ADMH Commissioner Boswell, who had been involved in the ARPA grant program and other veteran mental health issues.  Commissioner Davis immediately and forcefully noted to them that if they indeed brought what they asserted were ethics violations to his attention, then as an agency head, he was obligated by law to report those concerns to the Ethics Commission.  All three SBVA members acknowledged that fact, urged

Commissioner Davis to indeed make the report, with Commissioner Davis noting to them that he would send a copy of the resulting complaint narrative for their review. Commissioner Davis subsequently gathered the facts they had related and talked to additional witnesses they specifically mentioned. Once he had completed the written complaint narrative, Commissioner Davis sent the complaint to Mr. Berenotto, Mr. Kilpatrick, and Mr. Gedling for review and called them to remind them of his legal obligation to report the matter and of the extreme confidentiality of the issue. All responded affirmatively, and Mr. Gedling even responded on July 31, 2024, with an e-mail that said "[f]ully understand on the confidentiality. We have your back, and you are only doing what's right."

31.    Alabama Code § 36-25-17 (a), a section of the Alabama Code of Ethics for Public Officials, provides that "[e]very governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter." Pursuant to that requirement, and after speaking with additional witnesses, on July 22, 2024, Davis filed an ethics complaint against ADMH Commissioner Boswell and others.

32.    In August 2024, an unknown person leaked the ethics complaint to the news media. Davis did not.

33.    On August 26, 2024, the Ethics Commission notified Commissioner Boswell that it was dismissing the ethics complaint against her. On August 27, 2024, the Ethics Commission notified Commissioner Davis that it was dismissing the ethics complaint, simultaneously thanking him for understanding his obligation under Alabama Code §36-25-17(a) to report the entire issue to them.

34.    Upon information and belief, Ivey became upset that Davis had filed the Ethics Complaint, despite his legal requirement to do so.

9

35.     On September 5, 2024, the Governor's office, via a legal assistant, e-mailed a letter to Commissioner Davis and ADVA Administrative Officer Wendi Findley stating that "his service must come to an end" and asked for Davis's resignation by 5:00 PM that day to be effective September 30, 2024. (Exhibit A) Ivey's decision to terminate Davis was done without a vote by the SBVA and without providing due process to Davis as required by Alabama Code § 31-5-6. Alabama law is clear that Ivey did not have the authority or discretion to terminate Davis or require his resignation.

36.     Ivey's September 5 letter also stated that "ample cause exists for your removal" because "your agency mishandled an ARPA grant program." Those accusations were false, and Ivey knew or should have known they were false and were stated merely as a pretext for Ivey's personal animosity towards Davis.

37.     Ivey simultaneously released her letter to the news media thus publicly defaming Davis.

38.     On September 6, 2024, Ivey, apparently recognizing that she did not have the legal authority to fire Davis, wrote Davis again stating that since he had not resigned, she was calling a special meeting of SBVA to consider his removal as Commissioner. (Exhibit B) In that letter, which Ivey also simultaneously released to the press, she claimed that Davis and the ADVA mishandled the $7 million in ARPA grant funds. This statement was false and Ivey knew or at least should have known it was false. In fact, all funds were preserved and returned to the Department of Finance and, as a result of Davis's efforts, the grant program was successful without using any ARPA funds. In addition, the SBVA, not Davis or the ADVA, was solely in charge of selecting the ARPA grant recipients and solely appointed a special grant committee and retained all substantive power to make decisions on those grants. The ADVA staff, including Davis, were directed merely to provide administrative support to the SBVA's process. Also, Davis specifically recused himself

from even looking at the grant proposals that went to the independent reviewing panel and the SBVA. The ADVA's legal counsel was the only ADVA staff member to see the full proposals.

39.     Ivey learned of widespread opposition in the veteran's community to the September 5-6 events. Ivey's staff polled SBVA members, in violation of Alabama Open Meetings Act, *Alabama Code 1975* § 36-25A, on how they intended to vote in the upcoming meeting, commenting to several of those members that "we can count on your support of the Governor, can't we?" In the process, Ivey learned that a majority vote to remove Davis probably did not exist. The Governor's Chief of Staff, Ms. Liz Filmore then asked Davis to come to the Governor's office on September 9, 2024, for a meeting to ascertain if an SBVA specially called meeting could be avoided via a compromise agreement.

40.     Vice Chair Gedling also called Davis and represented to him that the SBVA had the votes to remove him from office for cause. Gedling also called at least one other SBVA member, in violation of Alabama Open Meetings Act, *Alabama Code 1975* § 36-25A, and had that member call Davis in turn to relate the same threat that Gedling had the votes to remove Davis for cause. At the time, Davis was approximately 16 months shy of his state retirement vesting.

41.     Based upon that representation by Gedling and the other Board member, Davis then feared that he would lose job, income and benefits and therefore, under duress, went to the State Capitol for that meeting with Ms. Filmore and the Governor's legal counsel, Mr. Will Parker.  That meeting was also attended in person by ADVA Assistant Commissioner Sandra Lucas and by Commissioner Davis's personal legal counsel, Mr. John Saxon, via telephone. Ivey also joined the meeting and stated that she hoped an agreement could be worked out.  An agreement was reached by which Davis would resign as Commissioner of ADVA effective December 31, 2024, and all agreed not to say anything in public that would be considered derogatory toward the other parties.  In addition,

11

Ivey agreed that neither she nor her staff would do anything to impair Commissioner Davis's ability to obtain future employment commensurate with his resume, even offering to give positive job referrals to any potential employer. Davis, while under duress, decided to resign and seek other state employment for which he was imminently qualified so he could maintain employment and his benefits. Both parties made a public statement shortly thereafter favorably touting that agreement.

42.     Shortly before October 9, 2024, Commissioner Davis noticed on the printed agenda for an upcoming October 9, 2024, SBVA committee meeting that he was being asked in that meeting to publicly discuss the entire ARPA grant timeline. Davis thus specifically approached the Chair of that committee, Mr. Charles Waugh, to ask what that agenda item entailed. Mr. Waugh explained that he wanted Commissioner Davis to go through the entire ARPA timeline in detail so that the committee had a thorough understanding of the entire process and address previous allegations that had been made of impropriety. He also specifically noted that he did not want Commissioner Davis to discuss his agreement with the Governor. Commissioner Davis followed the committee chair's specific request completely and then answered the committee's questions for well over an hour. At the end of that public meeting held under the Open Meetings Act, the SBVA committee unanimously voted to exonerate Commissioner Davis of any wrongdoing involving the entire ARPA grant program.

43.     On October 10, 2024, Mr. Waugh presented a committee report to the entire SBVA in their quarterly meeting. At the conclusion of that presentation, another SBVA member made a motion asking Commissioner Davis to rescind his previous resignation that was to take effect on December 31, 2024. That motion passed unanimously.

44.     On October 18, 2024, Ivey, who was upset with the SBVA's decision to request that Davis

not resign, sent a letter to Davis informing him that she was calling "a special meeting of the State

Board of Veterans Affairs to consider his immediate removal as Commissioner of the Department"

and that she regretted that Davis's "service must come to an end in this manner." Ivey's letter

made new, general allegations against Commissioner Davis to try to bolster her call for his

immediate removal, including, "general lack of cooperation," "breach of [the September 9, 2024]

agreement," "manipulation of the [SBVA]," "filing of frivolous ethics complaint," and "failure to

comply." (Exhibit C) These accusations were false and were done to pressure the SBVA to go

along with her desires to terminate Davis.

45.     Ivey's false accusations of "general lack of cooperation" and "general loss of trust and

confidence" related to public statements Davis had made regarding matters of public interest and

concern, including his criticism of the Alabama legislature's cuts to the GI Dependent Scholarship

program; his criticism of the legislature's and ADMH Commissioner's general lack of support for

veterans' mental health programs; his criticism of false criminal allegations by Rep. Ed Oliver

directed at the quality of care in state veterans homes; his criticism of the legislature for not

providing more ARPA funds, opioid settlement funds, or General Fund dollars to address critical

problems with veterans mental health; his criticism of Rep. Mike Rogers and his staffer Chris

Brinson for their past actions; and his criticism of Defendant Ivey for never having visited a single

one of the seventy facilities statewide overseen by ADVA. Davis's statements were true and were

expressed solely to help benefit veterans. While Davis may have stepped on some toes, his

statements were protected by the First Amendment and were done in a professional manner.

46.     That morning Ivey again simultaneously released the letter to the press and made a public

announcement to the news media, thus again defaming Davis. The letter called for another special

called meeting of the SBVA to remove Commissioner Davis immediately, with that meeting to be held at Ivey's convenience in the State Capitol on October 22, 2024.

47.     On October 22, 2024, at the specially called meeting of the SBVA, which Ivey did not attend, the SBVA voted to reject the immediate removal of Davis from the Commissioner position.

48.     Immediately after the vote was taken, the governor's legal counsel approached Davis and his lawyer and handed them a previously prepared letter (Exhibit D) from Ivey purporting to immediately remove Davis from the Commissioner position using what she claimed to be her "supreme executive power" despite the vote just taken by the SBVA. Ivey's position is contrary to Alabama law. *Ala. Code* § 36-16-7. This statute expressly limits the governor's power to terminate a "person who holds office or employment in any of the state executive departments and agencies by virtue of appointment by the incumbent Governor or any preceding Governor." Davis was not appointed to his position by Ivey nor any preceding governor. Instead, he was appointed by the SBVA pursuant to Alabama Code § 31-5-6, and could only be terminated for cause by the SBVA, which the SBVA voted not to do.

49.     In addition, Alabama Constitution Article 1, § 35 provides that "the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression." Ivey's termination usurped the statutory authority of the SBVA and thus violated Davis's statutory and constitutional rights.

50.     Despite the illegality of Ivey's purported termination, Davis proceeded to go to his office to immediately retrieve some personal effects of great importance but was advised by others not to do so, as members of Ivey's staff were already pre-staged outside his office with armed law enforcement officers to physically escort him off of the property and had alerted the news media

14

of their intentions. Davis instead proceeded to his personal home where a member or members of Ivey's personal protection detail were waiting in a state law enforcement vehicle in full view of his family and neighbors. One law enforcement agent stated that they had been ordered to confiscate any government property he had in his possession, which consisted merely of a government cell phone and office key/pass, though those items could have easily been turned over at the State Capitol when the Governor's counsel handed Davis and his attorney the termination letter.

51.    Ivey's conduct in terminating Davis was contrary to law and beyond any discretionary authority vested in her as Governor and violated Davis's clearly established rights afforded to him by the United States Constitution and Alabama law.

52.    As a proximate consequence of Defendant's willful, intentional, and malicious actions set out above, Plaintiff has suffered, and will continue to suffer, among other things, loss of income; loss of future retirement benefits; loss of medical insurance for him and his family; damage to his reputation; damages to his professional life and future career opportunities; other present and future pecuniary losses; and emotional pain, embarrassment, humiliation, and inconvenience.

<u>COUNT ONE</u>
**(FIRST AMENDMENT RETALIATION)**

53.    Plaintiff adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

54.    This cause of action is brought under 42 U.S.C. § 1983 and § 1985 to redress the deprivation, under color of state law, of rights guaranteed by the First Amendment to the Constitution of the United States.

55.    This claim is brought against Ivey in both her individual and official capacity.

56.    At all material times, Ivey was acting under color of state law.

15

57.    In taking the above-described actions, Ivey was acting outside her discretionary authority when she intentionally, maliciously, and willfully retaliated against Plaintiff for his clearly established constitutionally protected speech under the First Amendment, including terminating him from his position as Commissioner of the ADVA.

58.    Davis's constitutionally protected speech was encompassed in an official ethics complaint filed with the Alabama Ethics Commission and in other forms of speech.  Those items of constitutionally protected speech regarded matters of public interest and concern, specifically including, but not limited to, his criticism of the Alabama legislature's cuts to the GI Dependent Scholarship program; his criticism of the legislature's general lack of support for veterans' mental health programs; his criticism of false criminal allegations by Rep. Ed Oliver directed at the quality of care in our state veterans homes; his criticism of the legislature for not providing more ARPA funds, opioid settlement funds, or General Fund dollars to address critical problems with veterans mental health; and his criticism of Defendant Ivey for never having visited a single one of the seventy facilities statewide overseen by ADVA.

59.    Said speech played a substantial part in Ivey's decision to unlawfully terminate Davis from his statutorily appointed position of Commissioner of the ADVA.

60.    Ivey's termination of Davis violated Davis's clearly established statutory or constitutional rights of which Ivey knew or reasonably would have known.

61.    Ivey was not legally afforded the discretion to fire Davis and was in fact prohibited by law from firing him.

62.    Ivey's actions were for her own personal and vindictive reasons and were willful, malicious, illegal, fraudulent, in bad faith, beyond her authority, and/or at the very least under a mistaken interpretation of the law.

16

63.    As a proximate consequence of Ivey's willful, intentional, and malicious violation of Plaintiff's First Amendment rights, Davis has suffered, and will continue to suffer, among other things, loss of income; loss of future retirement benefits; loss of medical insurance benefits; damage to his reputation; damages to his professional life and future career opportunities; other present and future pecuniary losses; and emotional pain, embarrassment, humiliation, and inconvenience.

64.    **WHEREFORE, PREMISES CONSIDERED**, Plaintiff demands the following relief:

      A. That he be placed in the position in which he would have worked absent Ivey's retaliatory treatment (reinstatement), or, in lieu thereof, front pay;

      B. Back pay from the date of his retaliatory removal and for such raises as to which he would have been entitled;

      C. All benefits to which he was entitled, to include payments into the Retirement Systems of Alabama for the benefit of Plaintiff;

      D. Mental anguish damages;

      E. Punitive damages against Ivey, to deter such conduct in the future;

      F. Injunctive relief;

      G. Interest;

      H. Attorney's fees;

      I. Costs; and

      J. Any further, different, or additional relief to which he may be entitled.

## COUNT TWO
### (VIOLATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS)

65.    Plaintiff adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

66.    This claim is brought against Ivey in both her individual and official capacity.

67.    The due process clause of the fourteenth amendment to the United States Constitution provides that the State shall not "deprive any person of life, liberty, or property, without due process of law." *U.S. Const. Amend.* XIV, § 1.

68.    By virtue of the law, including Code of Alabama §31-5-6, at all material times Davis had a property interest in his position as ADVA Commissioner for a four-year term and could only be terminated by the SBVA and only for cause. Ivey's purported termination of Davis on September 5, 2024, violated Davis's clearly established statutory and constitutional rights of due process to only be terminated by the SBVA for cause of which Ivey knew or reasonably would have known.

69.    When presented with Ivey's allegations, the SBVA exonerated Davis.

70.    Ivey's second purported termination of Davis on October 18, 2024, again violated Davis's clearly established statutory or constitutional rights of due process to only be terminated by the SBVA for cause.

71.    When Davis was finally afforded his procedural due process rights by the SBVA at the specially called meeting by Ivey on October 22, 2024, the SBVA voted that Davis not be terminated.

72.    Ivey's purported termination of Davis immediately following the SBVA's decision was in violation of §31-5-6 and deprived Davis of his clearly established right to substantive due process in violation of the 14th Amendment of the United States Constitution.

73.    Ivey was not legally afforded the discretion to fire Davis and was in fact prohibited by law from firing him.

74.     Ivey's deprivation of Davis's rights to due process were done by Ivey under color of state law.

75.     As a result of Ivey's intentional violation of Davis's constitutionally protected rights to due process, Davis was injured and damaged as set out above.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff demands the following relief:

    A.  That he be placed in the position in which he would have worked absent Ivey's violation of due process or, in lieu thereof, front pay;

    B.  Back pay from the date of his retaliatory removal and for such raises as to which he would have been entitled;

    C.  All benefits to which he was entitled, to include payments by the State into the Retirement Systems of Alabama for the benefit of Plaintiff;

    D.  Mental anguish damages;

    E.  Punitive damages against the Governor, to deter such conduct in the future;

    F.  Injunctive relief;

    G.  Interest;

    H.  Attorney's fees;

    I.  Costs; and

    J.  Any further, different, or additional relief to which he may be entitled.

<u>**COUNT THREE**</u>
**(DECLARATORY JUDGMENT AND REQUEST FOR PERMANENT INJUNCTION)**

76.     Plaintiff adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

77.    This Claim is brought pursuant to 28 *U.S.C.* § 2201; *F.R.C.P.* 57; Alabama *Code* § 6-6-220

through 232; and *A.R.C.P* 57 against Ivey in her official capacity as Governor of the State of

Alabama.

78.  An actual and judiciable controversy exists between the parties with respect to the legality of

Ivey's purported termination of Davis. On the one hand Davis claims that pursuant to *Code of*

*Alabama* § 31-5-6, he could only be terminated by the SBVA for cause which the SBVA voted

not to do. On the other hand, Ivey claims that she had the "supreme executive power" to disregard

the law and Davis's constitutional rights and to terminate Davis.

79.   This Count requests that the Court settle and afford relief from uncertainty and insecurity

with respect to rights, status, and other legal relations between the parties.

WHEREFORE, Davis requests that the Court declare the following:

   A. That Ivey's purported termination was in violation of Davis's protected constitutional
       rights and Alabama law;

   B. That Ivey's purported termination be deemed null and void;

   C. That Ivey restore Davis to his position as Commissioner of the ADVA;

   D. That Ivey restore all financial benefits to which he would have received but for Ivey's
       wrongful termination of Davis;

   E. That Davis be afforded any and all other relief under the law.

**COUNT FOUR**
**(VIOLATION OF ALABAMA CODE § 36-25-24)**

80.    Davis adopts and realleges each and every allegation contained in this Complaint as if set

out anew herein.

81.    Alabama Code § 36-25-17(a) provides that "[e]very governmental agency head shall within

10 days file reports with the [Ethics] commission on any matters that come to his or her attention

in his or her official capacity which constitute a violation of this chapter."

82.     When members of the SBVA reported possible ethics violations of Commissioner Boswell and others to Davis, he was legally required to file a report with the Ethics Commission.

83.     Alabama Code § 36-25-24(a) prohibits a supervisor, including the Governor, from discharging, demoting, transferring, or otherwise discriminating against a public employee regarding such employee's compensation, terms, conditions, or privileges of employment based on either the employee's reporting a violation or what he or she believes in good faith to be a violation of this chapter, or the employee's giving truthful statements or truthful testimony concerning an alleged ethics violation.

84.     Alabama Code § 36-25-24(d) provides that a supervisor who violates this law is subject to a civil action.

85.     Ivey's purported terminations of Davis were in violation of the anti-retaliation provision thereof, § 36-25-24-(a).

86.     Ivey's conduct was willful, malicious, illegal, fraudulent, in bad faith, beyond her authority, and/or at the very least under a mistaken interpretation of the law.

87.     As a result of this retaliation and discharge, Davis was injured and damaged as set out above.

        **WHEREFORE, PREMISES CONSIDERED,** Davis demands judgment against Defendant Ivey in a fair and reasonable amount of compensatory and punitive damages plus interest and costs.

### COUNT FIVE
### (WRONGFUL TERMINATION)

88.     Plaintiff adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

21

89.     On October 22, 2024, when Ivey terminated Davis, she claimed that the "Alabama Constitution confers on the Governor the 'supreme executive power of this state,'" pursuant to which she removed Davis immediately.

90.     Ivey's claim was wrong in that that provision did not authorize Ivey to fire Davis.

91.     Section 36-13-7 of the Code of Alabama limits the Governor's power "to remove from office and discharge from employment, with or without cause, any person who holds office or employment in any of the state executive departments and agencies **by virtue of appointment by the incumbent Governor or any preceding Governor** . . ." (Emphasis added.) Neither Ivey nor any preceding Governor appointed Plaintiff and thus she was prohibited from firing Davis.

92.     Pursuant to *Alabama Constitution,* Article V, Section 120, Ivey, as Governor, was required to "take care that the laws be faithfully executed." Ivey breached this duty by violating Alabama Code § 31-5-6, § 36-13-7, and § 36-25-24(a).

93.     The Alabama Constitution does not give Ivey, nor any governor, the power to disregard the laws of the State.

94.     In taking the above-described actions, Ivey intentionally, maliciously, willfully, and illegally retaliated against Davis and failed to "take care that the laws be faithfully executed."

95.     Ivey's conduct was willful, malicious, illegal, fraudulent, in bad faith, beyond her authority, and/or at the very least under a mistaken interpretation of the law.

96.     As a result, Davis was injured and damaged as set out above.

        **WHEREFORE, PREMISES CONSIDERED**, Davis demands judgment against Defendant Ivey in a fair and reasonable amount of compensatory and punitive damages plus interest and costs.

### COUNT SIX
### (INVASION OF PRIVACY)

97.     Davis adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

98.     Ivey invaded Davis's privacy by putting him in a false light and position in the eyes of the public by falsely accusing him of "general lack of cooperation;" "mishandling of ARPA grant program;" "filing of frivolous ethics complaint;" "breach of [the September 9, 2024] agreement;" "manipulation of the [SBVA];" "failure to comply;" and "general loss of trust and confidence."

99.     These statements were highly offensive and Ivey knew they were false and knew the false light in which Davis was placed.

100.    The statements were made and published with actual malice and with knowledge and intent to hurt and discredit Davis.

101.    The information placed Davis in a false light in the public eye and the false light was highly offensive to any reasonable person.

102.    Ivey's conduct was willful, malicious, fraudulent, in bad faith and beyond her authority and/or at the very least under a mistaken interpretation of the law.

103.    Ivey's conduct violated Davis's constitutional and statutory rights which rights were clearly established at the time of the conduct. Any reasonable official would understand that the actions violated those rights and were not exercise of discretionary functions. Liability is necessary to hold Ivey accountable for her excessive use of power and in violation of Davis's clearly established statutory or constitutional rights

104.    The false light Davis was put in caused him harm as set out above.

         **WHEREFORE, PREMISES CONSIDERED**, Davis demands judgment against Defendant Ivey in a fair and reasonable amount of compensatory and punitive damages plus interest and costs.

## COUNT SEVEN
### (DEFAMATION)

105.    Davis adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

106.    Ivey maliciously and publicly accused Davis of "general lack of cooperation;" "mishandling of ARPA grant program;" "filing of frivolous ethics complaint;" "breach of [the September 9, 2024] agreement;" "manipulation of the [SBVA];" "failure to comply;" and "general loss of trust and confidence."

107.    Ivey's accusations were false and were made and published with actual malice and with knowledge of their falsity.

108.    Ivey's conduct was willful, malicious, fraudulent, in bad faith and beyond her authority and in violation of Davis's clearly established statutory or constitutional rights

109.    Ivey's conduct violated Plaintiff's constitutional and statutory rights which rights were clearly established at the time of the conduct. A reasonable official would have understood that the actions violated those rights and were not exercise of discretionary functions. Liability is necessary to hold Ivey, and future governors, accountable for the excessive use of power.

110.    As a result, Davis was injured and damaged as set out above.

**WHEREFORE, PREMISES CONSIDERED**, Davis demands judgment against Defendant Ivey in a fair and reasonable amount of compensatory and punitive damages plus interest and costs.

## COUNT EIGHT
### (INTENTIONAL INTERFERENCE WITH BUSINESS RELATION)

111.    Davis adopts and realleges each and every allegation contained in this Complaint as if set out anew herein.

112.    At all material times, Davis had a business relationship with the SBVA; had a property interest in his job as the Commissioner of the ADVA; and could only be terminated by the SBVA for cause.

113.    Ivey had knowledge of the business relation and knew she did not have the authority to terminate Davis.

114.    Ivey intentionally interfered with Davis's business relation with the SBVA by unlawfully terminating Davis.

115.    There was no justification for Ivey's interference with Davis's job.

116.    Ivey's conduct was willful, malicious, fraudulent, in bad faith and beyond her authority and in violation of Davis's clearly established statutory and constitutional rights

117.    As a result, Davis was injured and damaged as set out above.

**WHEREFORE, PREMISES CONSIDERED,** Davis demands judgment against Defendant Ivey in a fair and reasonable amount of compensatory and punitive damages plus interest and costs.

Kenneth J. Mendelsohn (ASB 7113N64K)
Attorney for Plaintiff

**OF COUNSEL:**

**JEMISON & MENDELSOHN , P. C.**
1772 Platt Place
Montgomery, Alabama 36117
(334) 213-2323 (Telephone)
(334) 213-5663 (Facsimile)
Email: kenny@jmfirm.com

## PLAINTIFF DEMANDS A TRIAL BY A STRUCK JURY ON ALL CLAIMS SO TRIABLE.


OF COUNSEL

*Defendant shall be served by certified mail as follows:*

Kay E. Ivey
Governor of Alabama
600 Dexter Avenue
Montgomery, AL 36130

### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing pleading has been served upon the Attorney General of the State of Alabama by United States Mail on this the 11th day of June, 2025.


OF COUNSEL