**Case No. 2:25-cv-00429-MHT-SMH**

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

---

**REAR ADMIRAL W. KENT DAVIS (RET.),**

***Plaintiff,***

**v.**

**KAY E. IVEY, in her individual capacity and her official capacity as Governor of the State of Alabama,**

***Defendant.***

---

# Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss

---

Kenneth J. Mendelsohn
*Counsel for Plaintiff*

JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, AL 36117
(334) 213-2323
kenny@jmfirm.com

# TABLE OF CONTENTS


TABLE OF CONTENTS……………………………………………...………………2

TABLE OF AUTHORITIES……………………………………………………..3

INTRODUCTION……………………………………………………………8

FACTS…………………………………………………….……………..8

MOTION TO DISMISS STANDARD…………………………….……...………….15

ARGUMENT…………………………………………………………...…….…….15

I. Count One---Davis's First Amendment Retaliation Claim…………………………...16

II. Count Two---Davis's Procedural and Substantive Due Process Claim…….….….…20

III. Davis is Entitled to Injunctive Relief on His Federal Claims (Counts I and II)……..26

IV. Davis is Entitled to Declaratory Judgment/Injunctive Relief………………….…….27

V. Supplemental Jurisdiction Is Not at Issue……………………………...………..27

VI. Counts Four through Eight - Davis's State-Law Claims…………….………...………..27

A. Ivey Did Not Have the Authority to Terminate Davis………………...………..28

B. Ivey is not afforded State Immunity ……………………………………...……28

C. Ivey is not afforded State-Agent Immunity……………………………………..33

D. Ivey in her Individual Capacity is Liable for Monetary Damages (Counts Four and Five)…………………………………………………..………35

E. Ivey Retaliated Against Davis in Violation of Alabama Code § 36-25-24…...…..37

F. Davis Stated a Valid Claim for Wrongful Termination (Count Five)……...……..38

G. Davis Stated Valid Claims for Invasion of Privacy and Defamation (Counts Six and Seven)…………………………………..………………..40

H. Ivey Can Be Held Liable for Intentional Interference (Count Eight)……….……..41

CONCLUSION ……………………………………………………………………..43

CERTIFICATE OF SERVICE……………………………………………………...44

# TABLE OF AUTHORITIES

**CASES**

*Alabama Dep't of Transp. v. Harbert Int'l, Inc.*,
990 So.2d 831, 840 (Ala.2008)………………………………………….……………… 29

*Barnes v. Dale*,
530 So. 2d 770, 781 (Ala. 1988)……………………….……………..…….28, 31, 32

*Barnhart v. Ingalls*,
275 So. 3d 1112 (Ala. 2018)…………………………………………………..……36

*BellSouth*,
814 So.2d at 214……………………………………………………………………41

*Bias v. Cenlar Agency, Inc.*,
No. 2:15-CV-00768-SGC, 2018 WL 2365428, at *5 (N.D. Ala. May 24, 2018)………..40

*Birmingham v. Graffeo*,
551 So. 2d 357, 364 (Ala. 1989)…………………………………..……………21, 22

*Brown v. Georgia Dept. of Revenue*,
881 F.2d 1018, 1025 (11th Cir. 1989)……………………...…………………………20

*Carruth v. Bentley*,
942 F.3d 1047, 1054 (11th Cir. 2019)……………………………………..…….20

*Cleveland Board of Education v. Loudermill*,
470 U.S. 532, 538 (1985)…………………………………………………...……..21, 22

*Coleman v. City of Dothan,*
598 So.2d 873, 875 n. 2 (Ala.1992)…………………………………….……………..30

*Cooper v. Smith*,
1:12-CV-889-WKW, 2013 WL 252382, at *2 (M.D. Ala. Jan. 23, 2013)………………30

*DeStafney v. University of Alabama,*
413 So.2d 391, 393 (Ala.1981)……………………………………………………31, 32

*Elmore v. Fields*,
45 So. 66, 67 (Ala. 1907)…………………………………………………...…………29

*Ex parte Alabama Dept. of Mental Health and Retardation,*
837 So. 2d 808, 814 (Ala. 2002)……………………………………………………35

*Ex parte Butts,*
775 So.2d 173, 177 (Ala.2000)……………………………………...…...………. 33, 35

*Ex parte Cranman,*
792 So.2d 392 (Ala.2000)……………………………………………...………….29, 33

*Ex parte Davis*,
930 So. 2d 497, 500 (Ala. 2005)…………………………………...……………….29

*Ex parte Estate of Reynolds,*
946 So.2d 450, 452 (Ala.2006)………………………………………………………..33

*Ex parte Haralson,*
853 So. 2d 928, 933 (Ala. 2003)…………………………………………...……….30

*Ex parte Lawley*,
38 So. 3d 41, 43–44 (Ala. 2009)……………………………….………………….31, 33

*Ex parte Pinkard*,
373 So. 3d 192, 199 (Ala. 2022)…………………………...…………...……..29, 36, 37

*Foulke v. Weller*,
2024 WL 2761778, at *5……………………………………….…………………...19

*Giambrone v. Douglas*,
874 So. 2d 1046, 1052 (Ala. 2003)……………………………………………………33

*Gill v. Sewell*,
356 So.2d 1196, 1198 (Ala.1978)……………………………………..……28, 31, 32

*Hardric v. City of Stevenson*,
843 So. 2d 206, 210 (Ala. Civ.App. 2002)…………………………………………….39

*Kirkpatrick v. Geneva Cnty. Bd. of Educ.*,
2015 WL 5853778, at *3 (M.D. Ala. Oct. 6, 2015)…………………………….……16, 19

*Lumpkin v. Cofield,*
536 So.2d 62, 65 (Ala.1988)……………………………………………………….31, 32

*Lyons v. River Road Constr., Inc.*,
858 So.2d 257, 261 (Ala.2003)…………………………………………………..…..28, 32

*Mitchell v. Town of Hayneville, Alabama*,
2020 WL 7480551, at *9 (M.D.Ala. Dec. 18, 2020)……………………...………….. 39

*Ohio Valley Conf. v. Jones*,
385 So. 3d 948 (Ala. 2023)……………………………...…………...…………..36

*Patton v. Black,*
646 So.2d 8, 10 (Ala.1994)…………………………………………………………35

*Pennington v. Taylor*,
776 F. Supp. 3d 1118, 1141–42 (M.D. Ala. 2025)……………………...………….19

*Phillips v. Thomas*,
555 So. 2d 81, 83 (Ala. 1989)…………………………………………..……31, 32

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*,
391 U.S. 563, 574 (1968)……………………………………………...……16, 17, 18

*Raley v. Main*,
987 So. 2d 569, 575 (Ala. 2007)………………………………..…………………..28

*Regions Bank v. Plott*,
897 So. 2d 239, 244 (Ala. 2004)……………………………………...……………40

*Riley v. Cornerstone Community Outreach, Inc.*,
57 So. 3d 704 (Ala. 2010)………………………………………...………….8, 25, 26

*Sellers v. Nationwide Mut. Fire Ins. Co.*,
968 F.3d 1267, 1273 (11th Cir. 2020)……………………………………..………..27

*St. Clair County v. Town of Riverside,*
272 Ala. 294, 296, 128 So.2d 333, 334 (1961)……………………………………31, 32

*State ex rel. Gray v. King*,
395 So. 2d 6, 7 (Ala. 1981)…………………………………………………...………39

*Summit Med. Assocs. v. Pryor*,
180 F.3d 1326, 1337, 1338 (11th Cir. 1999)……………………………..……………26

*Taylor v. Troy State Univ.*,
437 So.2d 472, 474 (Ala.1983)……………………………………………………..29

*Terry v. RCHP-Florence, LLC,*
671 F. Supp. 3d 1321, 1325 (N.D. Ala. 2023)…………………...………………..41, 42

*The Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564, (1972)……………………………………………………………..21

*Unzicker v. State,*

346 So.2d 931, 933 (Ala.1977)……………………………………………………31, 32

*Wal-Mart Stores, Inc. v. Smitherman*,
872 So. 2d 833, 840 (Ala. 2003)……………………………………………………41

*Wells v. McCovery*,
No. 2:22CV600-MHT, 2025 WL 2423744, at *1 (M.D. Ala. Aug. 21, 2025)…………..15

*White v. Birchfield,*
582 So.2d 1085, 1088 (Ala. 1991)…………………...………………………..30, 31, 32

*White Sands Group, L.L.C. v. PRS II, LLC*,
32 So. 3d 5, 14 (Ala. 2009)……………………………………………………………41

**STATUTES**

ALA. CODE § 6-5-182……………………………………………………………………..40

ALA. CODE § 31-5-2……………………………………………………..…………………8

ALA. CODE § 31-5-3……………………………………………………..…………………8

ALA. CODE § 31-5-6…………………………..………8, 12, 14, 15, 18, 19, 20, 22, 25, 26, 39

ALA. CODE § 36-1-12……………………………………………………….…………..33

ALA. CODE § 36-16-7……………………………………………………………………15, 20

ALA. CODE § 36-25-17 ……………………………………………………...……11, 37, 38

ALA. CODE *1975* § 36-25A…………………………………………...………………12, 13

ALA. CODE § 36-25-24……………………………………………...………………..37

ALA. CODE § 36-25-27…………………………………………………………………..37, 38

ALA. CONST. art. I, § 14………………………………………………………28, 29, 31, 32

ALA. CONST. art. V, § 113……………………………………..………………………24

ALA. CONST. art. V, § 120…………………………………..…………………8, 25, 26, 31

Act 2024- 412……………………………………………...…………………………10

## INTRODUCTION

The Office of Governor does not come with a crown. Yet the focus of Ivey's treatment of Davis and her Motion to Dismiss are based on her idea that she has the "supreme executive power" to decide what she thinks is best regardless of what the U. S. Constitution or state laws require. As anyone who passed sixth grade civics knows, there are 3 separate branches of government and Ivey's role as Governor was to execute the laws, not disregard them. ALA. CONST. art. V, § 120. Ivey tries to support her claim through the case of *Riley v. Cornerstone Community Outreach, Inc.*, 57 So. 3d 704 (Ala. 2010). As will be discussed in detail below, that case does not give a governor unbridled authority to violate the law. Importantly, in that case the court recognized that the "governor obviously is not a king" *Id.* at 729. So too, Ivey is not the Queen of Alabama. She is an elected official charged with the responsibility to uphold the laws, not violate them.

## FACTS

Davis set out detailed facts in paragraphs 5 through 52 of his Complaint (Doc 1) In response to Ivey's Motion to Dismiss (Doc 12), Davis will point out the pertinent facts below.

In 1945, the Alabama Legislature created the State Department of Veterans' Affairs, to operate under a State Board of Veterans' Affairs ("SBVA") and to be headed by a State Service Commissioner. *Code of Alabama* § 31-5-2. (Doc. 1, ¶ 5) Per this statute, the Governor served as chair of the Board and along with several appointed representatives of the state's veteran community. *Code of Alabama* § 31-5-3. (Doc. 1, ¶ 6) Pursuant to *Code of Alabama* § 31-5-6 the SBVA had the duty "to appoint a State Service Commissioner who shall serve for a term of four years subject to removal by the State Board for cause .... " (Doc. 1, ¶ 7)

In 2019, Davis was appointed Commissioner by the SBVA. In 2022, Davis was unanimously reappointed by the SBVA to a second four-year term that began in February 2023. As a matter of law, Davis was not appointed nor hired by Ivey and did not serve at Ivey 's pleasure. (Doc. 1, ¶ 8)

During Davis's second term, the ADVA received $5 million in American Rescue Plan Act ("ARPA") funds to address veterans mental health needs in its State Veterans Homes. (Doc. 1, ¶ 9) In June 2023, the Alabama Department of Finance approached the ADVA regarding an additional $2 million in funds available for veterans' mental health. (Doc. 1, ¶ 10)

The Alabama Department of Mental Health ("ADMH") was consulted and advised using a Request for Proposals (RFP) process and also indicated they were open to the idea of administering the grants and suggested an interagency agreement. (Doc. 1, ¶ 11) Thereafter, the ADVA signed a Memorandum of Agreement (MOA) with the ADMH for assistance in administering the grant program based on its experience, expertise, and knowledge of administering grant programs with ARPA funds; the entire $7 million in grant funds were thus transferred to ADMH. (Doc. 1, ¶ 12) The ADVA regularly communicated, worked, and met with representatives of the ADMH during the following months to discuss the grant program. (Doc. 1, ¶ 16)

Unbeknownst to Davis at the time, ADMH Commissioner Kim Boswell became upset about the amount of work for her department under the MOA and the fact that she did not like some of the grant recipients. Also unbeknownst to Davis, Commissioner Boswell became upset with John Kilpatrick, an SBVA member and official affiliated with two potential grant recipients. (Doc. 1, ¶ 20) Although there was a dispute resolution process required by the ADVA-ADMH MOA, Commissioner Boswell ignored the procedure and presented Commissioner Davis with a termination letter of the MOA with agency counsel Beverly Gebhardt present. The ADMH never

had made any indication of any issues or concern with the grant program to Davis prior to the termination letter, including during an extensive April 2 meeting. Also, unbeknownst to Davis, Commissioner Boswell sent a copy of the termination letter listing serious but false allegations to the Alabama Department of Finance. (Doc. 1, ¶ 21)

Following the termination of the MOA, the ADMH returned the $7 million of ARPA funds to the ADVA. (Doc. 1, ¶ 22) In turn, the ADVA transferred the entire $7 million of ARPA funds to the Finance Department. (Doc. 1, ¶ 29)

Since Boswell and ADMH at the last minute refused to serve as grant administrator and destroyed the ADVA's obligations to provide funds to the grant recipients that had already been selected and notified of their awards, Davis sought to find an alternate solution to provide grant funds to the intended veterans' mental health programs. (Doc. 1, ¶ 22) Davis was aware that Troy University had its own grant program which provided the expertise and capability to administer sizeable grants. Therefore, Davis contacted Troy and it agreed to serve as the grant administrator. Troy and the ADVA entered into an MOA. (Doc. 1, ¶ 23) Also, Davis was able to convince the Alabama State Legislature to appropriate sufficient funds through Senate Bill 66 to authorize the ADVA to utilize Veterans Assistance Fund dollars as an alternate option for funding the grant program. SB66 received final legislative passage on May 8. It became a law when signed by Governor Ivey on May 17, 2024, making it Act 2024- 412. (Doc. 1, ¶ ¶ 24, 25)

Finance Director Bill Poole informed Davis that Finance had looked into the allegations against him and the SBVA regarding the grant program and found that the procedures they used were good. Director Poole also commended Commissioner Davis for finding alternate funding for the grant program. (Doc. 1, ¶ 28)

On July 9, 2024, before a quarterly meeting of the SBVA in Enterprise, Alabama, Davis was approached by 3 members of the SBVA who expressed to Davis what they characterized as ethics concerns surrounding the actions of various external parties, including ADMH Commissioner Boswell, who had been involved in the ARPA grant program and other veteran mental health issues. (Doc. 1, ¶ 30) Alabama Code § 36-25-17 (a), a section of the Alabama Code of Ethics for Public Officials, provides that "[ e ]very governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter." Pursuant to that requirement, and after speaking with additional witnesses, on July 22, 2024, Davis filed an Ethics Complaint against ADMH Commissioner Boswell and others. (Doc. 1, ¶ 31)

On August 27, 2024, the Ethics Commission notified Commissioner Davis that it was dismissing the ethics complaint but thanked him for understanding his obligation under Alabama Code §36-25-17(a) to report the entire issue to them. (Doc. 1, ¶ 33) The Ethics Commission did not determine that the Ethics Complaint was frivolous. Davis alleged in his Complaint and has reasons to believe that Ivey became upset that Davis had filed the Ethics Complaint against her friend, ADMH Commissioner Boswell, despite Davis's legal requirement to do so. (Doc. 1, ¶ 34)

On September 5, 2024, less than 2 weeks after the Ethics Complaint was dismissed, Ivey sent a termination letter to Davis. (Doc.1 ¶ 35, Doc. 1-1) The letter specifically stated that Davis's "service must come to an end" and asked for Davis's resignation by 5:00 PM that day to be effective September 30, 2024. Ivey's decision to terminate Davis was done without a vote by the SBVA and without providing due process to Davis as required by Alabama Code § 31-5-6. (Doc.1 ¶ 35, Doc. 1-1) The letter also falsely accused Davis and his agency of mishandling the ARPA grant program. Ivey simultaneously released her letter to the news media, thus publicly defaming Davis. Davis

alleged in his Complaint and will produce evidence through discovery that Ivey knew or should have known that her accusations were false and were stated merely as a pretext for Ivey's personal animosity towards Davis. (Doc.1 ¶ 36) Indeed, if Ivey truly believed that Davis mishandled $7 million of ARPA funds, she would not have signed into law a Bill that provided Davis and the SBVA with millions of state dollars to replace the ARPA funds.

On September 6, 2024, Ivey, apparently recognizing that she did not have the legal authority to fire Davis, wrote Davis again stating she was calling a special meeting of SBVA to consider his removal as Commissioner. (Doc. 1-2) In that letter, which Ivey also simultaneously released to the press, Ivey claimed that Davis and the ADVA mishandled the $7 million in ARPA grant funds. This statement was false and Ivey knew or at least should have known it was false. In fact, all ARPA funds were preserved and returned to the Department of Finance and, as a result of Davis's efforts, the grant program was successful without using any ARPA funds, but instead using funds appropriated by the legislature and approved of by Ivey. (Doc.1 ¶ 37)

Ivey learned of widespread opposition in the veteran's community to her purported termination of Davis. Ivey's staff polled SBVA members, in violation of Alabama Open Meetings Act, *Alabama Code 1975* § 36-25A, on how they intended to vote in the upcoming meeting, commenting to several of those members that "we can count on your support of the Governor, can't we?" In the process, Ivey learned that a majority vote to remove Davis probably did not exist. At Ivey's direction, her Chief of Staff then asked Davis to come to the Governor's office on September 9, 2024, for a meeting to ascertain if an SBVA specially called meeting could be avoided via a compromise agreement. (Doc.1 ¶ 37)

Davis was also contacted by the SBVA Vice Chair who falsely represented to him that the SBVA had the votes to remove him from office for cause. The Vice Chair also called at least one

other SBVA member, in violation of Alabama Open Meetings Act, *Alabama Code 1975* § 36-25A, and had that member call Davis in turn to relate the same threat. At the time, Davis was approximately 16 months shy of his state retirement vesting. (Doc.1 ¶ 40) Naturally, Davis feared that he would lose his job, income and benefits and therefore, under duress, went to the State Capitol for that meeting with Ivey and her staff. An agreement was reached by which Davis would resign as Commissioner of ADVA effective December 31, 2024, and all agreed not to say anything in public that would be considered derogatory toward the other parties. In addition, Ivey agreed that neither she nor her staff would do anything to impair Davis's ability to obtain future employment commensurate with his resume, even offering to give positive job referrals to any potential employer. Davis, while under duress, decided to resign and seek other state employment for which he was imminently qualified, so he could maintain state employment and his benefits. Both parties made a public statement shortly thereafter favorably touting that agreement. (Doc.1 ¶ 41)

On October 9, 2024, the SBVA held a committee meeting in which it asked Davis to go through the entire ARPA timeline in detail so that the committee could get a thorough understanding of the entire process and address previous allegations that had been made of impropriety. At the end of that public meeting held under the Open Meetings Act, the SBVA committee unanimously voted to exonerate Commissioner Davis of any wrongdoing involving the entire ARPA grant program. (Doc.1 ¶ 42) On October 10, 2024, the SBVA in its quarterly meeting unanimously voted to ask Davis to rescind his previous resignation. (Doc.1 ¶ 43)

On October 18, 2024, Ivey, who was upset with the SBVA's decision to request that Davis not resign, sent a letter to Davis informing him that she was calling "a special meeting of the State Board of Veterans Affairs to consider his immediate removal as Commissioner of the Department"

and that she regretted that Davis's "service must come to an end in this manner." (Doc 1-3) Although this meeting was supposed to provide Davis with his due process rights guaranteed by the Constitution and *Code of Alabama* § 31-5-6, it is clear that Ivey planned on firing Davis even if the Board found there was no just cause to do so. In this letter which Ivey provided to the Press for publication, she falsely accused Davis of "general lack of cooperation," "breach of [the September 9, 2024] agreement," "manipulation of the [SBVA]," "filing of frivolous ethics complaint," and "failure to comply." (Doc 1-3) Ivey made these accusations to pressure the SBVA to go along with her unrelenting desire to terminate Davis. (Doc.1 ¶ 44)

Ivey's false and nebulous accusations of "general lack of cooperation" and "general loss of trust and confidence" related to public statements Davis had made regarding matters of public interest and concern, including his criticism of the Alabama legislature's cuts to the GI Dependent scholarship program; his criticism of the legislature's and ADMH Commissioner's general lack of support for veterans' mental health programs; his criticism of false criminal allegations by Rep. Ed Oliver directed at the quality of care in state veterans homes; his criticism of the legislature for not providing more ARPA funds, opioid settlement funds, or General Fund dollars to address critical problems with veterans mental health; his criticism of Rep. Mike Rogers and his staffer Chris Brinson for their past actions; and his criticism of Defendant Ivey for never having visited a single one of the seventy facilities statewide overseen by ADVA. Davis's statements were true and were expressed solely to help benefit veterans. (Doc.1 ¶ 45)

Also on October 18, Ivey released her latest letter to the press and made a public announcement to the news media, thus defaming Davis once again. The letter called for another special-called meeting of the SBVA to remove Commissioner Davis immediately, with that meeting to be held at Ivey 's convenience in the State Capitol on October 22, 2024. (Doc.1 ¶ 46)

On October 22, 2024, at the specially-called meeting of the SBVA, which Ivey did not attend, the SBVA voted to reject the immediate removal of Davis from the Commissioner position. (Doc.1 ¶ 47) Immediately after the vote was taken, the governor's legal counsel approached Davis and his lawyer and handed them a previously prepared letter (Doc 1-4) from Ivey purporting to immediately remove Davis from the Commissioner position using what she claimed to be her "supreme executive power" despite the vote just taken by the SBVA. Ivey 's position is contrary to Alabama law. *Ala. Code* § 36-16-7. This statute expressly limits the governor's power to terminate a "person who holds office or employment in any of the state executive departments and agencies by virtue of appointment by the incumbent Governor or any preceding Governor." Davis was not appointed to his position by Ivey nor any preceding governor. Instead, he was appointed by the SBVA pursuant to Alabama Code § 31-5-6 and could only be terminated for cause by the SBVA, which the SBVA voted not to do. (Doc.1 ¶ 48)

## MOTION TO DISMISS STANDARD

Recently, in *Wells v. McCovery*, No. 2:22CV600-MHT, 2025 WL 2423744, at *1 (M.D. Ala. Aug. 21, 2025) the Court restated the well-settled Motion to Dismiss Standard as follows:

> In considering a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. See *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).
>
> To survive a Rule 12(b) (6) motion to dismiss, a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but rather "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I. COUNT ONE---DAVIS'S FIRST AMENDMENT RETALIATION CLAIM

"To set forth a free-speech claim," a plaintiff must show that: "(1) [he] was speaking as a citizen on a matter of public concern; (2) [his] interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action.'" *Kirkpatrick v. Geneva Cnty. Bd. of Educ.*, 2015 WL 5853778, at *3 (M.D. Ala. Oct. 6, 2015) (Thompson, J.) (citing *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007) and *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014)). Davis meets each of these elements.

The State of Alabama has failed our veterans especially those suffering from physical injuries, PTSD and other mental disabilities acquired while protecting our country in battle. Davis's public statements concerning the lack of care for veterans are matters of public concern. The well-being of our veterans and the States' failures in adequately caring for veterans are certainly matters of public concern.

Ivey, however, claims that since Davis was acting as the Commissioner of SBVA, he does not have First Amendment protections against retaliation for making those statements. That is not the law. In *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 574 (1968) the Supreme Court noted that "statements by public officials on matters of public concern must be accorded First Amendment protection." That case, as the Court is well aware, involved a schoolteacher who was wrongfully terminated for sending a letter critical of the local school board. The Court stated that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* at 572 The same analysis applies here. Davis, as Commissioner, definitely has informed and well thought out opinions on the lack of treatment

of veterans, including those with mental health issues. Like the teacher in *Pickering,* Davis must be able to speak out freely on such questions without fear of retaliatory dismissal.

Davis alleged and will prove during discovery that his speech played a substantial or motivating role in the adverse employment action. Ivey made clear in her letter October 18, 2024, (Doc 1-3) that her termination of Davis was based on false accusations of "general lack of cooperation," "breach of [the September 9, 2024] agreement," "manipulation of the [SBVA]," "filing of frivolous ethics complaint," and "failure to comply." Davis's allegations in his Complaint, which are deemed to be true, show that Ivey's false accusations of "general lack of cooperation" and "general loss of trust and confidence" related to public statements Davis had made regarding matters of public interest and concern, including his criticism of the Alabama legislature's cuts to the GI Dependent scholarship program; his criticism of the legislature's and ADMH Commissioner's general lack of support for veterans' mental health programs; his criticism of false criminal allegations by Rep. Ed Oliver directed at the quality of care in state veterans homes; his criticism of the legislature for not providing more ARPA funds, opioid settlement funds, or General Fund dollars to address critical problems with veterans mental health; his criticism of Rep. Mike Rogers and his staffer Chris Brinson for their past actions; and his criticism of Defendant Ivey for never having visited a single one of the seventy facilities statewide overseen by ADVA. Davis's statements were true and were expressed solely to help benefit veterans. (Doc.1 ¶ 45)

Ivey attempts to avoid liability by making factual statements that are contrary to Davis's allegations in the Complaint and will later be proven to be false. For example, in her letters purportedly terminating Davis and on page 29 of her Motion (Doc 12), Ivey claims the Ethics Complaint was frivolous. Just because Ivey says it was frivolous does not make it true. There was

no determination made by the Ethics Commission that the Ethics Complaint was frivolous and Davis maintains that it was not. If anything, this is an issue that should be raised at the summary judgment phase but not on a 12(b) Motion.

The same holds true for Ivey's other conclusory claims regarding Davis's conduct. On page 30 of her Motion (Doc 12) Ivey states that she had an interest in cross-executive agency cooperation and functionality. Whether there was a lack of cross-executive agency cooperation and whether Davis was responsible for such lack of cooperation will be a highly disputed issue. Even assuming there were issues between Davis and Ivey's appointed Mental Health Commissioner, Ivey still did not have the statutory authority to fire Davis.

On page 33 of her Motion (Doc 12) Ivey claims that the *Pickering* Balancing Test does not prohibit a governor from firing an executive official based on policy disagreements. Under the facts of this case, Ivey is wrong. First, as a matter of law, Ivey did not have the authority to terminate Davis. *Ala. Code* § 31-5-6. Second, Ivey's claim on page 34 of her Motion (Doc 12) that Davis's speech "impeded the government's ability to perform efficiently" is another disputed fact that cannot be decided at this early stage. Third, Ivey's claim on page 34 that the Governor and the State are entitled to agency heads who work to further, rather than impede, the State's policies in the areas those agency heads oversee and that it is thus "reasonably possible" that Plaintiff's speech could have caused "adverse harm" to the State's operations. However, at this stage, it is equally as possible that Davis's speech did not cause harm to the State's operations. Indeed, the Board did not think so when it exonerated Davis. Most importantly, the Pickering Test does not supersede the Constitution.

**Ivey is not entitled to Sovereign Immunity in this case.**

Ivey's quotation of *Pennington v. Taylor*, 776 F. Supp. 3d 1118, 1141–42 (M.D. Ala. 2025) while correct is incomplete. Your Honor also stated the following:

> While state officials, in their official capacities, are usually entitled to sovereign immunity, the Supreme Court, in *Ex parte Young*, 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), recognized an exception allowing federal claims for injunctive relief to be brought against state officials. The Court explained that when an official's conduct violates federal law, that official is stripped of the cloak of sovereign immunity, as the "state has no power to impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. 441. Thus, to ensure the supremacy of federal law, and consistent with the traditions of equity, plaintiffs may ask a federal court to enjoin state officials from enforcing "state laws that are contrary to federal law." *Jackson*, 595 U.S. at 39, 142 S.Ct. 522; *see also Ex parte Young*, 209 U.S. at 160, 28 S.Ct. 441.

*Id.* at 1141–42 (M.D. Ala. 2025). Here, Ivey violated Davis's First Amendment rights and as will be shown in the next section his Due Process rights which are protected by the U. S. Constitution and Alabama Code § 31-5-6.

Ivey also is not entitled to qualified immunity, most certainly not at this early stage of the litigation. Davis agrees with Ivey's statement on 36 of her Motion (Doc 12) that " '[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Foulke*, 2024 WL 2761778, at *5." Here, Ivey's termination of Davis violated the clearly established law set out *Alabama Code* § 31-5-6 which provided that Davis could only be fired by the Board and only for cause. When the Board found no just cause and voted not to terminate Davis, Ivey usurped the Board's statutory authority and fired Davis anyway. Ivey cannot violate clear laws and established rights, fire Davis and now claim she has immunity.

In *Kirkpatric, supra,* Your Honor stated that "[q]ualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's

supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Here, the law was clearly established. Ivey did not have the authority to fire Davis. Every reasonable official, or for that matter, anyone who reads *Alabama Code* § 31-5-6 would know that Ivey lacked the authority to fire Davis.

Ivey cited *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019) for the proposition that to "receive" the protections of "qualified immunity," the Governor "must first prove that [she] was acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred." If she "makes this showing, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* Davis agrees with Ivey's analysis but not her application of it to the facts of this case. The law is clear that Ivey did not have the "discretionary authority" to fire Davis; only the Board could and only for cause. Moreover, Ivey's "discretionary authority" to fire any executive branch official is severely limited by state statute, and Ivey clearly violated that statute. *Ala. Code* § 36-16-7

## II. DUE PROCESS

**Davis had a property interest in his job**

The issue of whether Davis had a property interest in his job is not subject to dispute. It is well settled that "as a matter of federal law a property interest is created whenever a public employee can only be fired 'for cause.'" State law determines whether a particular employee is terminable at will or only for cause. *Brown v. Georgia Dept. of Revenue*, 881 F.2d 1018, 1025 (11th Cir. 1989) Here, *Code of Alabama* § 31-5-6 provided that "[i]t shall be the duty of the State Board of Veterans' Affairs to appoint a State Service Commissioner who shall serve for a term of four

years **subject to removal by the State Board for cause**." (emphasis added) Thus, Davis was not an employee at will but rather an employee who had a statutorily protected right to only be fired for cause and only by the Board.

In *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, (1972) the Supreme Court addressed the issue of whether a non-tenured professor hired for a specific one-year term had a property interest in continued employment. Although the Supreme Court found that under the facts of that case the professor had no such property interest, the Court's analysis shows that Davis clearly had a property interest in his job as Commissioner. Please consider the following from the Court's Opinion:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577. Davis certainly had the expectation, pursuant to state law, that he would continue in his 4-year term of office and that he could only be terminated for cause by the Board. Accordingly, Davis clearly had a property interest in his job.

On page 41 of her Motion (Doc 12) Ivey claimed that *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985) and *Birmingham v. Graffeo*, 551 So. 2d 357, 364 (Ala. 1989) "establishes that public officials like Plaintiff have no property right in their positions." Ivey is simply incorrect. In *Loudermill,* two school district employees brought suit alleging they were wrongfully discharged in violation of their due process rights. The Supreme Court reviewed the

applicable state statute which provided that the employees were entitled to retain their positions during good behavior and efficient service who could not be dismissed except for misfeasance, malfeasance, or nonfeasance in office. *Loudermill*, at 538–39 The Court then held that the statute plainly supports the conclusion that the discharged employees possessed property rights in continued employment. *Id.* The ultimate issue in that case was what process was due to those plaintiffs; not whether they had rights to due process. Actually, that case supports Davis's claim that he had a property interest in his job.

*Graffeo* does not in any way relate to this case. It involved a city council member elected under Birmingham's at-large system, whose term was shortened after the City enacted an ordinance providing for single-member districts. Graffeo was not fired by the Mayor nor the City Council. Moreover, there was no statute similar to *Code of Alabama* § 31-5-6 setting out that Graffeo could only be discharged "for cause." The mere fact that the Alabama Supreme Court found that Graffeo did not have a property interest in his elected position under those circumstances does not detract from the decisions of the U. S. Supreme Court and Eleventh Circuit holdings that property rights arise when a statute or other regulation provide that the employee can only be fired for cause.

The question here is whether *Code of Alabama* § 31-5-6, which guaranteed Davis a four-year term subject only to termination for cause, provided Davis with a property interest in his position. The only possible answer is yes.

As a final matter on this topic, Davis needs to address Ivey's claim in footnote 13 on page 41 of her Motion (Doc 12) that Davis's Due Process claims should be dismissed because, as she reads Count III, Davis is bringing this claim "directly under the Fourteenth Amendment and not under 42 U.S.C. § 1983." Ivey ignores the fact that in the opening paragraph of his Complaint

(Doc. 1) Davis specifically alleged he was making "claims under 42 U.S.C. § 1983 and § 1985 to redress the deprivation, under color of state law, of rights guaranteed to Davis by the Constitution of the United States for Ivey knowingly violating clearly established First and Fourteenth Amendment rights." Paragraph 65 under Count II specifically states that Davis "adopts and realleges each and every allegation contained in this Complaint as if set out anew herein." Ivey obviously was on notice that Davis was making a §1983 claim for due process violations. Indeed, Ivey referred to §1983 several times in her Due Process argument. Should the Court be inclined to agree with Ivey's overly technical analysis on this issue, Davis would request the opportunity to amend his Complaint to include the following paragraph:

> 65A. This cause of action is brought under 42 U.S.C. §1983 and §1985 to redress the deprivation, under color of state law, of rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Respectfully, Davis should not be required to do so.

**Ivey violated Davis's rights to Due Process**

Ivey's claim beginning on page 45 of her Motion (Doc 12) that she "Supplied Plaintiff with the Constitutional Minimum Due-Process Requirements" is contrary to the facts of this case. On September 5, 2024, Ivey terminated Davis. (Doc 1-1) Ivey can try to claim that she was merely asking Davis to resign but the letter specifically stated that "I regret that your service must come to an end in this manner." This obviously was a termination. Not only did this termination violate *Code of Alabama* § 31-5-6, but it did not provide him with the opportunity to be heard before the SBVA or even before the Governor.

Ivey apparently recognized or learned that she did not have the authority to terminate Davis on her own, so she sent another letter the following day in which she stated she was calling a special meeting of the SBVA to consider Davis's removal as Commissioner. This letter clearly was a termination letter as well because Ivey again stated that "I regret that your service must come to an end in this manner." (Doc 1-2) Thus, even though there was going to be an SBVA Board meeting to determine if there was cause to fire Davis, it is clear that Ivey was going to terminate Davis regardless of what the Board decided and regardless of her lack of authority to terminate him.

On October 18, 2024, Ivey wrote Davis a letter notifying him that she was calling a special meeting of the Board to consider immediate removal of Davis as Commissioner. (Doc 1-3) Davis acknowledges that this letter does provide Davis with notice of the charges and an opportunity to appear before the Board and to be heard. However, as just one member of the SBVA, Ivey did not have the authority to make these charges against Davis without Board approval. It is telling that Ivey stated in the letter "[a]s I've said before, I regret that your service must come to an end in this manner." Thus, it was clear that Ivey did not care what the Board decided, she was terminating Davis. Whether this Board Hearing, under these circumstances, complied with due process requirements is also questionable since Ivey planned on firing Davis regardless of the decision by the SBVA. In any case, what is most important here is that at the end of the Hearing, the Board voted to reject the removal of Davis from his position. Nothing in this statute, or actually any law, allowed Ivey to overrule the Board's decision.

**Ivey did not have the "Supreme Executive Power" to violate the law**

On page 48 of her Motion (Doc 12), Ivey claims that she had the right to terminate Davis regardless of what "a mere statute says." Davis acknowledges that ALA. CONST. art. V, § 113 provides "[t]he supreme executive power of this state shall be vested in a chief magistrate, who

shall be styled 'The Governor of Alabama.'" However, nothing in that provision or in any other authority gives Ivey or any past or future governor the unbridled authority to fire state employees who have constitutionally and statutorily protected rights to continued employment. Indeed, the law is to the contrary. ALA. CONST. art. V, § 120, which Ivey relies upon, provides "[t]he Governor shall take care that the laws be faithfully executed." Here, Ivey not only failed to see that *Code of Alabama* § 31-5-6 was followed, but she directly violated that law. In addition, Alabama Constitution Article 1, § 35 provides that "the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression." Ivey's termination usurped the statutory authority of the SBVA and thus violated Davis's statutory and constitutional rights.

Ivey's reliance on *Riley v. Cornerstone Community Outreach, Inc.*, 57 So. 3d 704 (Ala. 2010) is misguided. That case was essentially a dispute between Governor Bob Riley and Attorney General Troy King over who had the authority to enforce gambling laws. Governor Riley established a Task Force on Illegal Gambling which executed search warrants and seized alleged gambling machines from an electronic bingo facility in Lowndes County. The facility filed suit against Riley and other state officials claiming the bingo machines were legal. Riley and the other Defendants fought the lawsuit. During the litigation, AG King filed a Notice of Appearance seeking to take over the representation of the State Defendants and also attempted to dismiss the case. Essentially there was a standoff between Riley and King; the Governor sought to shut down the bingo parlor and the AG sought to keep it open. Thus, the Alabama Supreme Court was faced with the issue of which official had the authority to control the litigation. In finding that the governor had the authority to make the decision, the Alabama Supreme Court made clear that its decision was limited to that case. Specifically, the court stated the following:

> To decide this dispute between two constitutional officers over their respective spheres of authority, however, it is not necessary for us to decide whether the governor's discretion to make such a decision and act upon it is indeed "absolute" in relation to the other official, the concern expressed by the respondents. We are clear to the conclusion that, at least under circumstances such as those presented here, Governor Riley acted consistently with his constitutional authority.

*Id.* at 734. Nothing in that opinion even remotely suggests that ALA. CONST. art. V, § 120 gives Ivey or any future governors the right to disregard an employee's federal constitutional rights or a state statute that guarantees his right to due process.

## III. DAVIS IS ENTITLED TO INJUNCTIVE RELIEF

Ivey's argument on this point is circuitous. She claims she legally fired Davis despite the constitutional and statutory prohibitions against her doing but claims she has no power to correct this wrong. If she does not have the power to reinstate Davis, then she could not have had the power to fire him. Most certainly she can reinstate Davis if the Court orders her to do so.

Ivey points out on page 56 of her Motion (Doc 12) that the exception to Eleventh Amendment immunity does not permit a plaintiff "to adjudicate the legality of past conduct;" thus, a plaintiff must allege "an ongoing and continuous violation of federal law." *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1337, 1338 (11th Cir. 1999) Davis agrees with this general principle but what Ivey refuses to recognize is that there is an ongoing and continuous violation of Davis's federal rights. The wrongful termination deprived Davis of his income, retirement benefits, other state benefits and is still ongoing. He will continue to suffer unless and until his position and benefits are restored.

On page 57 of her Motion (Doc 12) Ivey pointed out that "since the Governor terminated Plaintiff, the Alabama Legislature has amended that statute. Pursuant to the current version of Alabama Code § 31-5-6, effective as of March 17, 2025, '[t]he Governor shall appoint a

commissioner to serve at the Governor's pleasure.' So, to the extent Plaintiff asserts that the Governor ever violated State law in terminating him, he cannot assert that that violation is ongoing, precluding application of *Ex parte Young*." This defeats Ivey's prior argument that she does not have the authority to reinstate Davis. Also, the fact that Ivey convinced the legislature to change the law to give the governor the power to hire and fire the Commissioner further proves that Ivey lacked the authority to do so when she fired Davis.

## IV. DAVIS IS ENTITLED TO A DECLARATORY JUDGMENT AND INJUCTIVE RELIEF

Under this section of her Motion (Doc 12), Ivey acknowledged that "a suit brought under the [Declaratory Judgment] Act must state some independent source of jurisdiction, such as the presentation of a federal question.'" *Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1273 (11th Cir. 2020). The present case presents the question of whether Ivey violated Davis's constitutional rights. His claims are not "grounded strictly in state law" as Ivey suggested on page 58.

## V. SUPPLEMENTAL JURISDICTION IS NOT AN ISSUE

Ivey's request that the Court decline supplemental jurisdiction is based on her presumption this Court is going to dismiss the federal claims. Since Davis has adequately set forth valid claims for violations of Davis's rights to Free Speech and Due Process, this Court does not have to even consider the supplemental or pendent jurisdiction issue raised by Ivey. In addition, comity does not prevent this Court deciding the limits of Ivey's authority or allow claims for monetary damages. Indeed, this Court and all federal courts routinely preside over state law claims.

## VI. COUNTS FOUR THROUGH EIGHT: DAVIS' STATE-LAW CLAIMS

**A. Ivey did not have the authority to terminate Davis.**

In this Section Ivey merely reasserts her claim that she has the authority to fire employees despite constitutional and statutory prohibitions from doing so. In other words, Ivey thinks she has the right to violate the law as long as she, in her own mind, thinks it is a good idea. For the reasons stated above. Ivey did not have the authority to fire Davis.

**B. Ivey Is Not Afforded State Immunity.**

Davis's State Law claims are against Ivey in her individual capacity only. Under the facts of this case, Ivey is not protected by absolute state immunity.

Article I, Section 14 of the Alabama Constitution only provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Section 14 does not provide absolute sovereign immunity to a governor in every case. The extensions of absolute immunity beyond just the State itself have been judicially created and limited to arms or agencies of the State, *Raley v. Main*, 987 So. 2d 569, 575 (Ala. 2007) and actions against state officers in their "official" capacities when those actions are, in effect, actions against the State. *Lyons v. River Road Constr., Inc.*, 858 So.2d 257, 261 (Ala.2003). Here, Davis's claims are against Ivey, not the State.

The Alabama Supreme Court has made clear that absolute immunity does not grant relief from liability to constitutional and executive officers in all cases. *Gill v. Sewell*, 356 So.2d 1196, 1198 (Ala.1978) ("Section 14 does not necessarily immunize State officers and agents from individual civil liability"). It is also settled that a state officer or employee may not escape tort liability by "arguing that his mere status as a state officer cloaks him with the state's constitutional immunity." *Barnes v. Dale*, 530 So. 2d 770, 781 (Ala. 1988). "It must stand to reason that no person can commit a wrong upon the property or person of another, and escape liability, upon the theory that he was acting for and in the name of the government, which is immune from suit, at the

instance of one of her subjects. *Elmore v. Fields*, 45 So. 66, 67 (Ala. 1907), *holding modified by Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000) The individual is not liable while acting for the state if the suit directly affects the state treasury, but the agent is liable for torts committed within his authority and cannot escape personal liability through the immunity shield *Ex parte Cranman*, 792 So. 2d 392, 399 (Ala. 2000), *holding modified by Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006) Because genuine individual-capacity claims run against officers personally, not against the State, the Alabama Supreme Court has traditionally held that such claims cannot trigger § 14's jurisdictional bar. *See Ex parte Pinkard*, 373 So. 3d 192, 199 (Ala. 2022)

Whether Section 14 Immunity serves as a defense to an action against a state officer, including a governor sued in her individual capacity, depends upon the degree to which the action involves a State interest. *Ex parte Davis*, 930 So. 2d 497, 500 (Ala. 2005) The "cases adhere to the view that the State has an interest such as will prohibit suit against the State official or employee where the action is, in effect, against the State." *Taylor v. Troy State Univ*., 437 So.2d 472, 474 (Ala.1983). An action is deemed to be against the State "when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiff's recovery of money from the State." *Alabama Dep't of Transp. v. Harbert Int'l, Inc*., 990 So.2d 831, 840 (Ala.2008) (quoting Alabama *Agric. & Mech. Univ. v. Jones,* 895 So.2d 867, 873 (Ala.2004)) (emphasis omitted). Such is not the case here. Davis's state law claims are against Ivey in her individual capacity only, not in her official capacity. Ivey will be personally responsible for paying a judgment in favor of Davis. A judgment will not result in recovery of money from the State Treasury. Simply put, this case is not "one against the State" as Ivey claims in her Motion (Doc 12).

The Alabama Supreme Court also has made clear that a constitutional officer can be held individually liable in tort for conduct outside "the course and scope of the officer's employment." *See, Ex parte Haralson,* 853 So. 2d 928, 933 (Ala. 2003); *Cooper v. Smith*, 1:12-CV-889-WKW, 2013 WL 252382, at *2 (M.D. Ala. Jan. 23, 2013) For example, Sheriffs who are executive officers and are afforded the same immunity as a governor do not have absolute immunity in all circumstances. *See Coleman v. City of Dothan,* 598 So.2d 873, 875 n. 2 (Ala.1992) ("We are careful to point out …that a sheriff is not entitled to absolute immunity in all situations."); *White v. Birchfield,* 582 So.2d 1085, 1088 (Ala. 1991) ("[B]y this opinion, we are not to be understood as granting absolute immunity to a sheriff in all situations.") In *Haralson,* the Alabama Supreme Court reviewed the trial court's denial of a Motion to Dismiss on claims against a deputy sheriff. The court recognized that Sheriffs are executive officers and that they and their deputies are sometimes afforded absolute immunity, but only when acting in the line and scope of their employment. In denying the deputy's Petition for Writ of Mandamus, the court held the following:

> We cannot conclude, at this early stage of the proceedings, without evidence showing that at the time of the accident he was acting within the line and scope of his employment, that Deputy Haralson is entitled to immunity. No State officer, such as a deputy sheriff, can avoid tort liability simply by claiming that his " 'mere status as a [S]tate official cloaks him with the [S]tate's constitutional immunity.' " *Phillips,* 555 So.2d at 83 (quoting *Barnes v. Dale,* 530 So.2d 770, 781 (Ala.1988)); see also *Mitchell,* 598 So.2d at 806. It is conceivable that Griffith could prove facts that would show that at the time of the accident Deputy Haralson was on a personal errand or otherwise had departed from the line and scope of his employment. If so, Griffith "may possible prevail" on her claims. See *Nance,* 622 So.2d at 299. Given the question presented by this mandamus petition—whether the trial court should have dismissed Griffith's claims against Deputy Haralson on the ground that he is entitled to State immunity—we conclude that Deputy Haralson has not shown that he has " 'a clear legal right ... to the order sought.'

*Id.* at 933 (Ala. 2003)

Similarly, in *Cooper,* District Judge Keith Watkins denied a Motion to Dismiss filed by a deputy. Judge Watkins noted that "under § 14 of the Alabama Constitution, deputy sheriffs, as alter egos to the Sheriff, are absolutely immune from state-law claims for damages whenever the acts

that are the basis of the alleged liability were performed within the course and scope of the officer's employment. The key question, then, is whether Defendants were acting in the course and scope of their employment." Here, Davis will prove that Ivey not only acted outside of the scope of the Office of Governor, but also grossly abused her authority by violating the U. S. Constitution and State law. The SBVA and only the SBVA had the authority to terminate Davis, and it found insufficient cause to terminate Davis. Ivey ignored the SBVA decision and her firing of Davis after the SBVA ruling was most certainly outside the scope of her authority; it was a direct violation of the law and ALA. CONST. art. V, § 120, which provides that "[t]he Governor shall take care that the laws be faithfully executed."

Again, contrary to Ivey's position, the law is clear that a state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. *White v. Birchfield*, 582 So. 2d 1085, 1088 (Ala. 1991); *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989) *See also*, *Lumpkin v. Cofield,* 536 So.2d 62, 65 (Ala.1988); *Barnes v. Dale,* 530 So.2d 770 (Ala.1988) ], at 782; *DeStafney v. University of Alabama,* 413 So.2d 391, 393 (Ala.1981); *Gill v. Sewell,* 356 So.2d 1196, 1198 (Ala.1978); *Unzicker v. State,* 346 So.2d 931, 933 (Ala.1977); *St. Clair County v. Town of Riverside,* 272 Ala. 294, 296, 128 So.2d 333, 334 (1961) In *Ex parte Lawley*, 38 So. 3d 41, 43–44 (Ala. 2009), suit was brought against several employees of the Department of Conservation, including its Director, a Cabinet Appointee. In considering whether the Defendants were entitled to State Immunity under Article I, § 14, the Alabama Supreme Court held as follows:

> As this Court stated in *Patton,* "[i]t is not for this court to determine, based on the complaint, whether the plaintiff will ultimately prevail, but only if he may possibly prevail." 646 So.2d at 10. It is conceivable that the families could prove facts that would show that one or more of the employees failed to discharge duties pursuant to a checklist or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a

> mistaken interpretation of the law. If so, the families "may possibly prevail" on their claims. Therefore, the trial court properly denied the employees' motion to dismiss the claims stated against them in their individual capacities.
>
> After the parties have had the opportunity to conduct discovery, the employees will have the opportunity to seek a summary judgment on the ground that they are entitled to State-agent immunity. If they make such a motion based on that ground and the trial court denies it, then they can again ask this Court to review their immunity claims, either by petitioning for permission to appeal, pursuant to Rule 5, Ala.R.App.P., or by petitioning for a writ of mandamus, pursuant to Rule 21, Ala.R.App.P.

Davis has properly alleged that Ivey's wrongful acts were willful, malicious, fraudulent, in bad faith and beyond her authority and can produce overwhelming evidence to support this position. (Doc 1, ¶¶ 86, 95, 102, 108 and 116) These are not just conclusions as Ivey suggests; the facts set out in the Complaint clearly support those allegations. Accordingly, Ivey is not entitled to be dismissed at this initial stage.

In summation, *Section 14* Sovereign Immunity only applies to the Sovereignty—the State. The Alabama Supreme Court's extension of absolute immunity to Sheriffs and Governors does not apply when the actions are outside the course and scope of the officer's employment or willful, malicious, illegal, fraudulently, in bad faith, beyond his authority or an illegal abuse of power, which is the case here. "Actions against State officials in their individual capacities are not prohibited by the doctrine of State immunity where it is alleged that [the State officials] ... acted fraudulently, in bad faith, beyond their authority or in a mistaken interpretation of law." *Lyons v. River Rd. Const., Inc.*, 858 So. 2d 257, 265 (Ala. 2003) A "state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. *White v. Birchfield*, 582 So. 2d 1085, 1088 (Ala. 1991); *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989) *See also*, *Lumpkin v. Cofield,* 536 So.2d 62, 65 (Ala.1988); *Barnes v. Dale,* 530 So.2d 770 (Ala.1988), at 782; *DeStafney v. University of Alabama,* 413 So.2d 391, 393 (Ala.1981); *Gill v. Sewell,* 356 So.2d 1196, 1198 (Ala.1978);

*Unzicker v. State,* 346 So.2d 931, 933 (Ala.1977); *St. Clair County v. Town of Riverside,* 272 Ala. 294, 296, 128 So.2d 333, 334 (1961)

**C. Ivey is not afforded State-Agency Immunity**

State-agent immunity is governed by *Alabama. Code* § 36-1-12 which is the codification of the test set out in *Ex parte Cranman, 792 So.2d 392 (Ala.2000)* a plurality opinion, which was later adopted by the Alabama Supreme Court in E*x parte Butt*s, 775 So.2d 173 (Ala.2000). That statute and *Cranman* provide that:

> An officer, employee, or agent of the state, including, but not limited to, an education employee, is immune from civil liability in his or her personal capacity when the conduct made the basis of the claim is based upon the agent's doing any of the following:
>
> (1) Formulating plans, policies, or designs.
>
> (2) Exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> > a. Making administrative adjudications.
> >
> > b. Allocating resources.
> >
> > c. Negotiating contracts.
> >
> > d. Hiring, firing, transferring, assigning, or supervising personnel.
>
> (3) Discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the state agent performs the duties in that manner.
>
> (4) Exercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons.
>
> (5) Exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
>
> (d) Notwithstanding subsection (c), an education employee, officer, employee, or agent of the state is not immune from civil liability in his or her personal capacity if:

> (1) The Constitution or laws of the United States, or the Constitution of this state, or laws, rules, or regulations of this state enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) The education employee, officer, employee, or agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

In determining whether State-agent immunity applies in a particular case, the Alabama Supreme Court established a "burden-shifting" process. *Ex parte Estate of Reynolds,* 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-Agent immunity bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State Agent to immunity. *Id*. Only if the State agent makes such a showing does the burden then shift to the Plaintiff to show that one of the two categories of exceptions to State-Agent immunity recognized in *Cranman* is applicable. *Ex parte Lawley*, 38 So. 3d 41, 47 (Ala. 2009); *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)

On page 64 of her Motion (Doc 12) Ivey claims that she clears the first hurdle because she was exercising her judgment in the administration of a department or agency of government. The facts and law do not support this claim. Ivey was not allowed to exercise judgment in terminating Davis. By law only the SBVA was granted that authority.

Assuming that Ivey can satisfy the first prong of the *Giambrone* test and the burden shifts to Davis, he can satisfy both of the exceptions. First, Ivey's termination of Davis violated the Constitution of the United States and laws of the State of Alabama. With respect to the second exception, the law is clear that if any employee fails to discharge her duties pursuant to detailed rules or regulations or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law, then that employee would not be entitled to State-

agent immunity. As the court stated in *Patton v. Black,* 646 So.2d 8, 10 (Ala.1994), '[i]t is not for this court to determine, based on the complaint, whether the plaintiff will ultimately prevail, but only if he may possibly prevail.' 646 So.2d. at 10. It is clear that Ivey failed to discharge duties pursuant to state law and acted willfully, maliciously, fraudulently, in bad faith, beyond his authority or under a mistaken interpretation of the law. Since Davis "may possibly prevail" on his claims, Ivey's Motion to Dismiss Davis's claims against her in her individual capacities should be denied." *See also, Ex parte Alabama Dept. of Mental Health and Retardation*, 837 So. 2d 808, 814 (Ala. 2002) *Ex parte Butts,* 775 So.2d 173, 178 (Ala.2000)

Further, the Alabama Supreme Court has made clear that a motion to dismiss is typically not the appropriate vehicle by which to assert qualified immunity or state-agent immunity, and normally, the determination as to the existence of such a defense should be reserved until the summary-judgment stage, following appropriate discovery. *Ex parte Alabama Dept. of Mental Health and Retardation,* 837 So.2d 808, 813-814 (Ala.2002). In that case, citing *Ex parte Butts,* 775 So.2d 173, 177 (Ala.2000) and *Patton v. Black,* 646 So.2d 8, 10 (Ala.1994), the Alabama Supreme Court stated that "it is the ***rare*** case involving the defense of State-agent immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6)."

**D. Ivey In Her Individual Capacity Can Be Held Liable for Monetary Damages.**

On page 66 of her Motion (Doc 12) , Ivey claims that she has no duty to pay Davis in her individual capacity. As explained above in the section regarding State-Agent Immunity, she most certainly can be held personally liable. Moreover, the cases she relies on do not support her position.

*Ohio Valley Conf. v. Jones*, 385 So. 3d 948 (Ala. 2023) cited by Ivey was a case where a collegiate athletic conference filed suit against chair of the board of trustees of a public university and against its university's president for refusal to pay the conference what the university allegedly owed under conference rules. It really has no relevance to this case. Further, in that case the Alabama Supreme Court relied on *Barnhart v. Ingalls*, 275 So. 3d 1112 (Ala. 2018), a case which the court later overruled in *Ex parte Pinkard*, 373 So. 3d 192 (Ala. 2022), the other case relied on by Ivey.

Surprisingly, Ivey set out a quote from *Pinkard* which Ivey noted was a cite from *Barnhart.* It is clear that *Barnhart* has no application here. Consider the following language from the *Pinkard* decision:

> The rule announced in *Barnhart* and extended in *Cooper* threatens to work an unprecedented, and unjustified, doctrinal shift. As noted above, Alabama courts have long recognized the right of tort victims to recover damages from State employees who injure them while acting within the scope of their official duties. *See, e.g., Elmore*, 153 Ala. at 351, 45 So. at 67; *Bronner*, 171 So. 3d at 622 n. 7. *Barnhart* and its progeny dispensed with that ancient rule by cloaking State agents with absolute and unqualified sovereign immunity for any claim alleging breach of an official duty, including individual-capacity tort actions. That result is unmoored from the text and history of § 14 and is at odds with this Court's more carefully reasoned precedents. Having recognized our mistake, we are determined not to repeat it. The expansive interpretation of § 14 announced in *Barnhart* and its progeny is overruled.
>
> In overruling these cases, we return to our pre-*Barnhart* understanding of § 14, which properly recognized that State immunity does not bar claims that name and seek relief only from individual officers in their personal capacity, as Taylor's claims against Pinkard do. *See Bronner,* 171 So. 3d at 622 n.7. The circuit court therefore had subject-matter jurisdiction over Taylor's claims.

*Ex parte Pinkard*, at 192, 201–02.

Moreover, in *Pinkard* the court held that the plaintiff's suit against Pinkard as an individual was not in effect a suit against the State, so State immunity did not preclude jurisdiction over the plaintiff's claims and because the record contained evidence from which a reasonable factfinder

could infer malice, Pinkard was not entitled to summary judgment on State-agent-immunity grounds. *Id.* at 203. Thus, *Pinkard* actually proves that Davis can make a claim against Ivey.

### E. Ivey Retaliated Against Davis in Violation of Alabama Code § 36-25-17.

Alabama Code § 36-25-17 provides as follows:

> (a) Every governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter.
>
> (b) Governmental agency heads shall cooperate in every possible manner in connection with any investigation or hearing, public or private, which may be conducted by the commission.

Accordingly, when members of the SBVA reported possible ethics violations by ADMH Commissioner Boswell, Davis was under a legal duty to file the Ethics Complaint. In fact, had he not done so, Davis could have been held criminally liable. *Ala, Code* §36-25-27, That statute provides in pertinent part the following:

> (a)(1) Except as otherwise provided, any person subject to this chapter who intentionally violates any provision of this chapter other than those for which a separate penalty is provided for in this section shall, upon conviction, be guilty of a Class B felony.
>
> (2) Any person subject to this chapter who violates any provision of this chapter other than those for which a separate penalty is provided for in this section shall, upon conviction, be guilty of a Class A misdemeanor.
>
> (7) Any person subject to this chapter who intentionally fails to disclose information required by this chapter shall, upon conviction, be guilty of a Class A misdemeanor.

To protect those who file Ethics Complaints, the Alabama Legislature enacted an anti-retaliation law. *Ala. Code* § 36-25-24. The pertinent portion of that statute follows:

> (a) A supervisor shall not discharge, demote, transfer, or otherwise discriminate against a public employee regarding the employee's compensation, terms, conditions, or privileges of employment based on either the employee's reporting a violation or what he or she believes in good faith to be a violation of this chapter, or the employee's giving

> truthful statements or truthful testimony concerning an alleged ethics violation, regardless of whether the employee filed the complaint.

(d) A supervisor who is alleged to have violated this section shall be subject to civil action. Ivey's termination letter (Doc 1-3) shows that a motivating factor in terminating Davis was his filing of the Ethics Complaint against ADMH Commissioner Boswell, an Ivey Cabinet appointee and friend of Ivey. As can be seen, contrary to Ivey's position, subsection (d) expressly grants Davis a cause of action against Ivey.

Ivey argues that the anti-retaliation law does not protect Davis and claims that she had the right to retaliate against Davis because of the position he held. Her attempts to distinguish between "public officials" and "public employees" makes no sense as it applies to the anti-retaliation statute. Certainly, the Alabama Legislature did not intend to protect "employees" but not "officials," especially when considered along with Alabama Code § 36-25-17 which requires officials to file Ethics Complaints and the fact that the official could be subjected to criminal liability under Alabama Code §36-25-27 if he did not. It is baffling that Ivey would even take this position. If she prevails on this argument, then all "public officials," who receive information of ethical violations by someone who is personally politically connected the governor, will face the dilemma of violating the law by not reporting the violation or face retaliation by the governor for reporting it irrespective of their due process rights.

Davis respectfully submits that this cause of action should not be dismissed, especially on a Rule 12(b) Motion. At the very least, Davis should be allowed to depose Ivey and others on this theory. Ivey will still be allowed to preserve this theory at the summary judgment stage.

### F. Davis Stated a Claim for Wrongful Termination

On page 67 of her Motion (Doc 12) Ivey, citing *Hardric v. City of Stevenson*, 843 So. 2d 206, 210 (Ala. Civ. App. 2002), acknowledged the well-settled Alabama law that "[t]he dismissal of a public employee who is entitled to a pretermination hearing, without such a hearing, is a wrongful act constituting a tort." Here, by statute, Davis was entitled to a pretermination hearing with the Board and could only be dismissed for cause. Ivey did not have the unilateral authority to fire Davis, yet that is exactly what she did by her letters attempting to terminate Davis without allowing him to appear before the Board and then firing him despite the Board's decision not to fire Davis.

Ivey also cited *Mitchell v. Town of Hayneville, Alabama*, 2020 WL 7480551, at *9 (M.D.Ala. Dec. 18, 2020) (Thompson, J.) for the proposition that "Alabama courts do allow suits for wrongful termination by public employees fired from tenure-protected positions." Davis again agrees. In *Mitchell,* this Court recognized that Police Chief Mitchell was not an employee-at-will, but by virtue of the law he was in a tenured-protected position explaining:

> As police chief, he was an appointed official of the town. *See* Amended Complaint (doc. no. 8) at ¶¶ 15-16. Town councils may remove an appointed official only for good cause, such as "incompetency, malfeasance, misfeasance, or nonfeasance in office and for conduct detrimental to good order or discipline." Ala. Code § 11-43-160(a)(2). Law-enforcement officers, including police chiefs, are also specifically entitled to a hearing before being suspended or terminated. *See* Ala. Code §§ 11-43-230 to -231.

*Id* at *5. The same applies to Davis. Alabama Code §31-5-6 provides that Davis could be fired only for cause and only by the SBVA. Clearly, Davis was not an employee-at-will; he too was in a tenured-protected position with a right to pursue a wrongful termination claim.

Ivey also relied on the case of *State ex rel. Gray v. King*, 395 So. 2d 6, 7 (Ala. 1981). That case has nothing to do with the present case. In that case, after a vacancy occurred in the job of Captain of the Birmingham Fire Department, the Chief picked one of the three candidates that were

certified to him. Thereafter, the President of the Birmingham Firefighters Association filed a *quo warranto* challenging the right of the selected candidate to serve as Captain. The Alabama Supreme Court stated that "[t]he principal issue presented in this appeal is whether a captaincy in the Birmingham Fire Department is a public office, and thereby subject to a quo warranto action against an alleged usurper, intruder, or unlawful holder of an office under s 6-6-591, Code 1975" and determined that *quo warranto* action will not lie. *Id.* at 8. Simply put, that case does not in any way detract from the clear law that public employees, such as Davis, who are wrongfully fired from their tenure-protected positions can maintain a cause of action for wrongful termination.

### G. Davis Stated Valid Claims for Invasion of Privacy and Defamation (Counts Six and Seven)

Ivey did not claim that Davis failed to state claims for Invasion of Privacy and Defamation. However, it is clear that Davis properly alleged those claims and set out substantial facts to support those causes of action.

Davis is making a claim for Invasion of Privacy under the False Light theory. To establish this claim Davis was only required to allege that Ivey (1) "gave publicity to a matter" concerning the Davis, (2) placed him in a "false light" that would be highly offensive to a reasonable person, and (3) did so with knowledge the publicized matter was false or with reckless disregard to its truth or falsity. *Bias v. Cenlar Agency, Inc.*, No. 2:15-CV-00768-SGC, 2018 WL 2365428, at *5 (N.D. Ala. May 24, 2018); *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) Paragraphs 98 through 102 in Davis's Complaint (Doc 1) satisfy that requirement.

With respect to the Defamation Count, *Alabama Code* § 6-5-182 provides that "the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff." In addition, the law is clear that the

"elements of a cause of action for defamation are: 1) a false *and* defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) Paragraphs 106 through 110 in Davis's Complaint (Doc 1) meets those elements.

**H. Ivey Can Be Held Liable for Intentional Interference**

Under Alabama law, the elements of this tort are as follows:

(1) the existence of a protectible business relationship;

(2) of which the defendant knew;

(3) to which the defendant was a stranger;

(4) with which the defendant intentionally interfered; and

(5) damage.

*Terry v. RCHP-Florence, LLC,* 671 F. Supp. 3d 1321, 1325 (N.D. Ala. 2023); *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009)

Davis properly alleged this cause of action and supported it with sufficient facts. Ivey only challenged number (3). Her argument is flawed. In *Terry,* the Federal District Court thoroughly considered the third element and denied the defendant's Motion to Dismiss. In doing so the court stated that "what is relevant is not whether the defendant *exercised* control over the plaintiff's contract or business relationship but whether the defendant had a *delineated right to do so. See BellSouth*, 814 So.2d at 214 (holding that BellSouth was not a stranger because it had the "legal

right to terminate Cellulink's relationship with Wal-Mart *directly*" due to its own "rights and duties" arising out of the relevant contracts between the three parties) (emphasis in original)" *Terry* at 1327. Here, as shown above, Ivey did not have a "delineated right" to terminate Davis. In fact, the law is clear that Ivey did not have the right to terminate Davis. Therefore, Ivey's Motion to Dismiss this cause of action is due to be denied.

## CONCLUSION

Ivey's termination of Davis violated his Constitutional and statutory rights. Ivey's claim that she has the "supreme executive power" to disregard Davis's rights cannot be condoned; most certainly not on a 12(b) Motion. For the reasons stated above, Davis respectfully submits that Ivey's Motion should be denied.

*/s/ Kenneth J. Mendelsohn*
KENNETH J. MENDELSOHN (ASB-7113-N64K)
Attorney for Plaintiff

OF COUNSEL:
**JEMISON & MENDELSOHN, P.C.**
1772 Platt Place
Montgomery, Alabama 36117
Phone:(334) 213-2323
Fax: (334) 213-5663
kenny@jmfirm.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on the 16th day of September, 2025, the foregoing was electronically filed using the CM/ECF filing system which will furnish a copy to all counsel of record.

*/s/ Kenneth J. Mendelsohn*
KENNETH J. MENDELSOHN (ASB-7113-N64K)