IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| W. KENT DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:25-cv-00429-BL |
| | ) | |
| KAY E. IVEY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**[1]

The Plaintiff, W. Kent Davis, initiated this suit against Kay Ivey in her individual capacity and official capacity as Governor of the state of Alabama on June 11, 2025. (Doc. 1). The Defendant has filed a motion to dismiss. (Doc. 12). The court requires further briefing to rule on the motion to dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint asserts eight counts: (1) Retaliation in violation of the First Amendment, (2) procedural and substantive violations of the Fourteenth Amendment Due Process Clause, (3) a count entitled "Declaratory

[1] This case was reassigned to the undersigned District Judge on November 13, 2025.

Judgment and Request for Permanent Injunction," (4) a violation of the anti-retaliation provision in Ala. Code § 36-25-24, (5) wrongful termination, (6) invasion of privacy, (7) defamation, and (8) intentional interference with business relation. (Doc. 1). The complaint seeks reinstatement, back-pay, employment benefits, compensatory damages, punitive damages, litigation costs, attorney's fees, interest, and declaratory and injunctive relief (styled as Count three). (Doc. 1). The Defendant argues that the Plaintiff fails to state a claim and that his claims are barred by immunity. The court will address each argument in turn.

**I. Sovereign Immunity**

The Defendant is correct that all of the Plaintiff's claims are barred by sovereign immunity to the extent they seek to obtain monetary damages from the Defendant in her official capacity as the Governor of Alabama. "Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Case v. Ivey*, 542 F. Supp. 3d 1245, 1269 (M.D. Ala. 2021), *aff'd*, No. 21-12276, 2022 WL 2441578 (11th Cir. July 5, 2022) ("Here, Defendants—the Governor of Alabama and the State Health Officer of Alabama—are unquestionably state officials. Thus, Defendants are entitled to Eleventh Amendment immunity on Plaintiffs' claims against them in their official capacities for monetary damages.").

The Plaintiff does not offer any argument on this issue. He only argues that his claims for equitable relief are not barred by sovereign immunity under *Ex parte Young*. The court need not address this argument because, for the reasons stated below, the Plaintiff has not stated a viable claim.

**II. Count I – First Amendment Retaliation**

The Defendant is correct that the Plaintiff fails to state a First Amendment retaliation claim.[2] In the Eleventh Circuit,

> to prevail on a First Amendment claim of unlawful retaliation, an employee must make three showings. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989). First, the employee must show that the speech was made as a citizen on a matter of public concern. *Id.* Second, the employee's free speech interest must outweigh the employer's interest in effective and efficient fulfillment of its responsibilities. *Id.* And third, the speech must have played a substantial part in the adverse employment action. *Id.* The first two inquiries are questions of law for the court. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 617-18 (11th Cir. 2015).

*Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023).

The Plaintiff alleges that two sets of speech motivated the Defendant to terminate him as Commissioner of the Alabama Department of Veterans Affairs: (1) "an official ethics complaint filed with the Alabama Ethics Commission" "against ADMH Commissioner Boswell and others," and (2)

> other forms of speech . . . specifically including, but not limited to, his criticism of the Alabama legislature's cuts to the GI Dependent

[2] Because the court will dismiss this claim on the merits, the court will not address her qualified immunity defense with respect to this claim.

> Scholarship program; his criticism of the legislature's general lack of support for veterans' mental health programs; his criticism of false criminal allegations by Rep. Ed Oliver directed at the quality of care in our state veterans homes; his criticism of the legislature for not providing more ARPA funds, opioid settlement funds, or General Fund dollars to address critical problems with veterans mental health; and his criticism of Defendant Ivey for never having visited a single one of the seventy facilities statewide overseen by ADVA.

(Doc. 1 at 9, 16). The Plaintiff has failed to allege that any of this speech was made as a citizen on a matter of public concern.

The Supreme Court has held as follows:

> [W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
>
> . . . .
>
> Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see *Pickering* [*v. Board of Education*, 391 U.S. 563 (1968)], or discussing politics with a co-worker, *see Rankin* [*v. McPherson*, 483 U.S. 378, 388 (1987)].
>
> When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

*Garcetti v. Ceballos*, 547 U.S. 410, 423–24 (2006).

In *Garcetti*, the Supreme Court described an exception to First Amendment protection for "speech that owes its existence to a public employee's professional responsibilities." 547 U.S. at 421–22. The court explained:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Contrast, for example, the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.

*Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006).

Regarding the ethics complaint, the Plaintiff alleges as follows:

> 30. On July 9, 2024, before a quarterly meeting of the [State Board of Veterans Affairs, "SBVA"] in Enterprise, Alabama, Commissioner Davis was approached by SBVA members Mr. Tony Berenotto and Mr. John Kilpatrick and was quickly joined by SBVA Vice Chair Mr. Scott Gedling. Those three members expressed to Commissioner Davis what they characterized as ethics concerns surrounding the actions of various external parties, including ADMH Commissioner Boswell, who had been involved in the ARPA grant program and other veteran mental health issues. Commissioner Davis immediately and forcefully noted to them that if they indeed brought what they asserted were ethics violations to his attention, then as an agency head, he was obligated by law to report those concerns to the Ethics Commission. All three SBVA members acknowledged that fact, urged Commissioner Davis to indeed make the report, with Commissioner Davis noting to them that he would send a copy of the resulting complaint narrative for their review. Commissioner Davis subsequently gathered the facts they had related and talked to additional witnesses they specifically mentioned. Once he

> had completed the written complaint narrative, Commissioner Davis sent the complaint to Mr. Berenotto, Mr. Kilpatrick, and Mr. Gedling for review and called them to remind them of his legal obligation to report the matter and of the extreme confidentiality of the issue. All responded affirmatively, and Mr. Gedling even responded on July 31, 2024, with an e-mail that said "[f]ully understand on the confidentiality. We have your back, and you are only doing what's right."
>
> 31. Alabama Code § 36-25-17(a), a section of the Alabama Code of Ethics for Public Officials, provides that "[e]very governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter." Pursuant to that requirement, and after speaking with additional witnesses, on July 22, 2024, Davis filed an ethics complaint against ADMH Commissioner Boswell and others.
>
> 32. In August 2024, an unknown person leaked the ethics complaint to the news media. Davis did not.

(Doc. 1 at 8–9).

Here, the Plaintiff alleges that he filed the ethics complaint against Commissioner Boswell pursuant to his official duties as a governmental agency head, as required by the Alabama Code of Ethics for Public Officials. (*See* doc. 1 at 9, ¶ 31). He does not allege that he would have made the ethics complaint as a private citizen if he had not been required to. Instead, he emphasizes that he was legally required to file the complaint as part of his role as Commissioner. (Doc. 1 at 8–9). Thus, the Plaintiff fails to allege that the statements contained in the ethics complaint were made as a private citizen. *See Garcetti*, 547 U.S. at 421–24.

The Plaintiff also fails to allege that the ethics complaint contained speech on matters of public concern. The Supreme Court has explained that speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted). This inquiry turns on the "content, form, and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). The Eleventh Circuit has stated:

> In determining whether an employee's speech touched on a matter of public concern, . . . the [court must] ask: whether the "main thrust" of the speech in question is essentially public in nature or private, . . . whether the speech was communicated to the public at large or privately to an individual, . . . and what the speaker's motivation in speaking was.

*Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1283–84 (11th Cir. 2006) (citations omitted).

It is also notable that the Plaintiff alleges that his ethics complaint was "extreme[ly] confidential[]" and that he did not disclose its contents, but it was "leaked" to the news media. (Doc. 1 at 9). In finding that the plaintiff's testimony touched on a matter of public concern in *Tindal v. Montgomery County Commission*, the Eleventh Circuit noted that the speech "took place in a public forum (a federal district court proceeding), not in a private context." 32 F.3d 1535, 1540 (11th Cir. 1994). In *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993), the court found that

the plaintiff's speech was not on a matter of public concern, observing that the speech largely focused on her supervisor's behavior and its effect on her work, was "in the form of complaints to official bodies," and did not draw "the public at large or its concerns into the picture." *See also Maggio v. Sipple*, 211 F.3d 1346, 1352 (11th Cir. 2000). Here, the Plaintiff filed a confidential ethics complaint with an official body. This supports a finding that the complaint was not speech on a matter of public concern.

The Plaintiff likewise fails to make this showing with respect to the "other speech." In a list, the Plaintiff generally describes the content of the statements, but he does not include any allegations about the form of the speech or the context within which the statements were made. Therefore, it is impossible for the court to determine that the statements were made as a citizen on matters of public concern, at least as defined by binding precedent. *See Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) ("To determine whether speech is made as a citizen on a matter of public concern, we must examine "the content, form, and context of a given statement."). While the Plaintiff is correct that the content of the speech as alleged in the complaint appears to address matters of public concern (doc. 16 at 16), there is not enough context provided for the court to review to resolve this nuanced legal

question. Because the Plaintiff has not satisfied this threshold inquiry, it is not necessary to apply the *Pickering* balancing test. Count I is due to be dismissed.[3]

## III. Count II – Fourteenth Amendment Due Process

As a preliminary matter, the court construes the Plaintiff's due process claim as one for substantive *and* procedural due process. In his complaint, the Plaintiff alleges a due process violation based on "rights of due process to only be terminated by the SBVA for cause." (Doc. 1 at 18, ¶ 68, 70). He alleges that he "was finally afforded his procedural due process rights by the SBVA at the special called meeting by Ivey on October 22, 2024," (doc. 1 at 18, ¶ 71), but that "Ivey's purported termination of [him] immediately following the SBVA's decision was in violation of [Section] 31-5-6 and deprived [him] of his clearly established right to *substantive due process* in violation of the 14th Amendment of the United States Constitution." (Doc. 1 at 18, ¶ 72) (emphasis added).[4] Nevertheless, Count II is entitled "Violation

[3] "A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002). The Plaintiff has only requested leave to amend his complaint on one narrow issue related to the due process claim. (*See* doc. 16 at 23).

[4] The Defendant argues that the Plaintiff's statement that he was "finally afforded his procedural due process rights" at the October 22 hearing warrants dismissal of the claim because that allegation is "self-defeating." (Doc. 12 at 45–47). The court is not persuaded. In light of the surrounding context, the Plaintiff alleges that the hearing *would have* satisfied due process if not

of *Procedural and Substantive* Due Process," (doc. 1 at 17–18), and the remainder of the allegations in the complaint assert violations of "due process" generally. (*See* doc. 1 at 19, ¶ 74) ("[The Defendant's] deprivation of [the Plaintiff's] rights to due process were done by [the Defendant] under color of state law."). Additionally, the Plaintiff asserts that he "had a property interest in his position as ADVA Commissioner," not that a fundamental liberty protected by the doctrine of substantive due process was infringed. (Doc. 1 at 18, ¶ 68).

Turning to the substance of his claims, the Defendant correctly contends that the Plaintiff cannot maintain a substantive due process claim based on his termination. (Doc. 17 at 26-27); s*ee Autery v. Davis*, 355 F. App'x 253, 255 (11th Cir. 2009) ("[A]n employee with a protected interest in his job may not maintain a substantive due process claim arising out of his termination."). Therefore, the court will dismiss Count II to the extent it seeks to bring a substantive due process claim.

The court is inclined to find that the Plaintiff has also not alleged a viable procedural due process claim. However, it is not, as the Defendant attempts to argue, because the claim fails for lack of a property right. As the Supreme Court has explained:

> Respondents' federal constitutional claim depends on their having had a property right in continued employment. *Board of Regents v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d

for the Defendant's subsequent intervening act of overriding the Board's decision not to terminate him.

> 548 (1972); *Reagan v. United States,* 182 U.S. 419, 425, 21 S.Ct. 842, 845, 45 L.Ed. 1162 (1901). If they did, the State could not deprive them of this property without due process. See *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561–1562, 56 L.Ed.2d 30 (1978); *Goss v. Lopez,* 419 U.S. 565, 573–574, 95 S.Ct. 729, 735–736, 42 L.Ed.2d 725 (1975).
>
> Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . ." *Board of Regents v. Roth, supra,* 408 U.S., at 577, 92 S.Ct., at 2709. *See also Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). The Ohio statute plainly creates such an interest. Respondents were "classified civil service employees," Ohio Rev. Code Ann. § 124.11 (1984), entitled to retain their positions "during good behavior and efficient service," who could not be dismissed "except . . . for . . . misfeasance, malfeasance, or nonfeasance in office," § 124.34. The statute plainly supports the conclusion, reached by both lower courts, that respondents possessed property rights in continued employment.

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985).

The Defendant relies on *City of Birmingham v. Graffeo*, 551 So. 2d 357, 363–64 (Ala. 1989), for the proposition that, according to the Alabama Supreme Court, the Plaintiff could not possess a property interest in his public office because it was created by the Alabama Legislature (*see* Ala. Code § 31-5-2). In *Graffeo*, the court reasoned as follows:

> Although some courts have referred to a public office as a species of property, the decisions generally are to the effect that no one has any private right of property in such office. *Higginbotham v. Baton Rouge,* 306 U.S. 535, 59 S.Ct. 705, 83 L.Ed. 968 (1939). 63A Am. Jur. 2d *Public Officers and Employees,* § 8 (1984). The fact that the Constitution throws a mantle of protection around a public officer, such as a limitation on the power of the legislature to abolish the office, that

> does not change the character of the office or make it property. *Taylor v. Beckham,* 178 U.S. 548, 20 S.Ct. 890, 900, 44 L.Ed. 1187 (1900); *see also* Article VII, § 175, Alabama Constitution of 1901.
>
> This Court has continually held that "a public office which the legislature creates is not the *property* of the office holder within the constitutional provision against depriving a man of property, nor does it *ever* become a *vested right* as against the right of the state to remove him." *Moore v. Watson,* 429 So.2d 1036 (Ala. 1983) (emphasis added).

*City of Birmingham v. Graffeo*, 551 So. 2d 357, 363–64 (Ala. 1989).

The Plaintiff acknowledges *Graffeo*; however, he argues that *Graffeo* "does not detract from the . . . U.S. Supreme Court and Eleventh Circuit holdings that property rights arise when a statute or other regulation provide that the employee can only be fired for cause." (Doc. 16 at 22). Specifically, the Plaintiff relies on *Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1025–27 (11th Cir. 1989). In *Brown*, the Eleventh Circuit reasoned as follows:

> Mr. Brown is a permanent employee governed by the Georgia Merit Systems Act. The Merit Systems Act states that "[p]ermanent status employees may be dismissed from employment or otherwise adversely affected as to compensation or employment status only if such action is taken in accordance with the rules and regulations of the State Personnel Board." O.C.G.A. § 45–20–8(a). The appellants argue that under state law Mr. Brown did not have a constitutionally protected property interest in his job because subsection (b) states "[t]his article is not intended to create a property interest in the job, but rather to create only a procedure under which permanent status employees can be dismissed or otherwise affected." According to the appellants property interests are "created and . . . defined by . . . state law," this express disclaimer ends the inquiry.
>
> The appellee argues that the Georgia Supreme Court's opinion in *Clark & Stephenson v. State Personnel Board,* 252 Ga. 548, 314 S.E.2d

658 (1984), interprets the statute to create a property interest. . . . Because the Act creates a constitutionally protected contract, the Court held that when a position is declassified, the employees are entitled to the protections of the Merit Systems Act before they are demoted. . . .

These two sources of state law initially create confusion as to whether the Merit Systems Act creates a constitutionally protected property interest. On closer look, however, it becomes apparent that the statutory disclaimer is not dispositive of the issue. The cases from the Supreme Court and this court reveal that the existence of a property interest is a matter of federal constitutional law that depends on an interpretation of state law. *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1976). More specifically, as a matter of federal law a property interest is created whenever a public employee can only be fired "for cause." State law determines whether a particular employee is terminable at will or only for cause. . . . In this case, since the Merit System Act, as interpreted by the Georgia Supreme Court in *Clark & Stephenson,* and the Personnel Board regulations require cause for dismissal, we find that the appellee had a property interest in his job. An analysis of the case law and the statute and regulations at issue will make this conclusion clear.

. . . .

. . . Since *Bishop* [*v. Wood*, 426 U.S. 341 (1976)], there has been no dispute that an employee has a property interest if he may only be dismissed for cause. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *cf. Memphis Light, Gas & Water,* 436 U.S. at 11, 98 S.Ct. at 1561. (Tennessee residents had a property interest in continued utility service because "[s]tate law does not permit a public utility to terminate service 'at will' "); *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975) (students had property interest in remaining at school because school officials had limited power to suspend students).

. . . .

Therefore the case law explains that the appropriate inquiry into whether a property interest exists is determined by considering whether under state law, the employee could be fired only for cause. We must

> look at both the Merit Systems Act and the Personnel Board's regulations. The appellant's argument that the statutory disclaimer ends the analysis misconstrues the function of state law in the analysis. "Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause" *Memphis Light, Gas, & Water Division,* 436 U.S. at 9, 98 S.Ct. at 1560 (emphasis added) (citations omitted).

*Brown*, 881 F.2d at 1025–27.

Here, the statute that created the Plaintiff's position stated[5] that he could only be terminated for cause. Alabama Code § 31-5-6(a) provided that "[t]he board shall appoint a commissioner to serve for a term of four years subject to removal by the board for cause." Therefore, like in *Brown*, the relevant state law makes clear that the Plaintiff could only be terminated for cause. Therefore, as a matter of federal constitutional law, it appears that the Plaintiff possessed a property right in his employment as Commissioner. Although the Alabama Supreme Court has stated in general that public officials do not have a property interest in their positions, that statement does not control this court's interpretation (under federal constitutional law) of the particular state law that governed the Plaintiff.

---

[5] The court is referencing the version of the statute that was in effect during the relevant period. As of March 17, 2025, Alabama Code § 31-5-6(a) was amended to omit the cause requirement. It now states: "The Governor shall appoint a commissioner to serve at the Governor's pleasure." (Doc. 12 at 57).

The Defendant makes three more arguments for the dismissal of the procedural due process claim: (1) that it fails to the extent it is based on a violation of state law, (2) that the notice and hearing provided were adequate, and (3) that the Defendant had the authority under state law to terminate the Plaintiff. As explained throughout this order, none of those arguments warrant dismissal of the claim. However, the court ultimately finds that the claim is likely due to be dismissed for a separate reason. "A district court may *sua sponte* dismiss an action if the court employs a fair procedure. *Tazoe*, 631 F.3d at 1336. A fair procedure generally requires notice to the parties of the court's intent to dismiss the action and an opportunity to respond. *Id.*" *Westley v. Alberto*, 703 F. App'x 727, 731 (11th Cir. 2017). Because the Plaintiff has not been provided notice of the defect the court has identified nor an opportunity to address it, the court will allow the Plaintiff to show cause as to why this defect does not warrant dismissal. The court's analysis of the claim is as follows:

The Plaintiff asserts that his due process rights were violated on September 5, 2024, (doc. 1 at 10, ¶¶ 35–36; doc. 1 at 18, ¶ 68), when the Defendant sent him a letter[6] stating, in pertinent part:

> I am writing to ask you to resign as State Service Commissioner for the Alabama Department of Veterans Affairs. If you notify my

[6] All of the letters referenced in this order were attached by the Plaintiff to his complaint. (*See* docs. 1-1, 1-2, 1-3, 1-4).

> office by 5:00 p.m. today that you are resigning as Commissioner, then you may make your resignation effective September 30, 2024.
>
> Ample cause exists for your removal as Commissioner. . . .
>
> . . . .
>
> I regret that your service must come to an end in this manner, but I believe a change of leadership at the Alabama Department of Veterans Affairs is essential for our State to make progress in serving Alabama veterans. Thank you for your service to our State.

(Doc. 1-1 at 2). The Plaintiff asserts that this was a termination letter, which was effectively immediately. (*See* doc. 1 at 18) ("Ivey's purported termination of Davis on September 5, 2024, violated Davis's clearly established statutory and constitutional rights of due process."); (doc. 16 at 11, 23).

The Plaintiff alleges that the Defendant sent him another letter on September 6, 2024, stating in pertinent part:

> I am writing to follow up on my letter to you dated yesterday, September 5, 2024, asking that you step down as State Service Commissioner for the Alabama Department of Veterans' Affairs. Because you have not chosen to resign voluntarily, I will be calling a special meeting of the State Board of Veterans' Affairs to consider your removal as Commissioner and the appointment of an Interim Commissioner for the Department.
>
> As I wrote yesterday, ample cause exists for taking this action. . . .
>
> . . . .
>
> The special-called meeting of the State Board will occur at 2:30 p.m. on September 10, 2024, in the board's conference room here in Montgomery. If you care to respond to the concerns I have expressed

> in this letter, please do so in the form of a written submission to the board provided to each of us no later than 5:00 p.m. on Monday, September 9, 2024. The special-called meeting will consist only of board votes on your removal and on the appointment of an Interim Commissioner. No public hearing will be held on either question.
>
> Again, I regret that your service must come to an end in this manner.

(Doc. 1-2 at 2–3). In his response brief, the Plaintiff argues based on these letters that, "even though there was going to be an SBVA Board meeting to determine if there was cause to fire [him], it is clear that [the Defendant] was going to terminate [him] regardless of what the Board decided and regardless of her lack of authority to terminate him." (Doc. 16 at 24). This argument is supported by the allegations in the complaint that "[the Defendant's] decision to terminate [the Plaintiff] was done without a vote by the SBVA" and that the accusation in the September 6 letter that "ample cause" existed for his termination was "false" and was "stated merely as a pretext for [the Defendant's] personal animosity towards [the Plaintiff]."). (Doc. 1 at 10, ¶¶ 35–36).

The Plaintiff further asserts that his due process rights were violated on October 18, 2024, (doc. 1 at 18, ¶ 70), when the Defendant sent him a letter stating, in pertinent part:

> I am writing to inform you that I will be calling a special meeting of the State Board of Veterans Affairs to consider your immediate removal as Commissioner for the Department.

> Alabama law currently provides that the Commissioner of Veterans Affairs is "subject to removal by the board for cause." I will be asking the Board to remove you for each of the following causes:
>
> . . . .
>
> The special-called meeting of the State Board will occur at 2:00 p.m. on Tuesday, October 22, 2024, in the Old Archives Room of the State Capitol here in Montgomery. If you care to respond to the concerns I have expressed in this letter, please do so in the form of a written submission to the Board provided to each of us no later than 5:00 p.m. on Monday, October 21, 2024.
>
> As I've said before, I regret that your service must come to an end in this manner. But I still believe that the best is yet to come for Alabama veterans.

(Doc. 1-3 at 2–4). The Plaintiff asserts that, "as just one member of the SBVA, [the Defendant] did not have the authority to make these charges against [the Plaintiff] without Board approval." (Doc. 16 at 24; *see also* doc. 1 at 18, ¶¶ 68, 70). The Plaintiff again argues based on this letter that "[the Defendant] did not care what the Board decided, she was terminating [him]." (Doc. 16 at 24). The Plaintiff also argues that the Board hearing itself did not satisfy due process because "[the Defendant] planned on firing [him] regardless of the decision by the SBVA." (Doc. 16 at 24). Finally, the Plaintiff argues that his due process rights were violated when the Defendant overruled the decision of the Board not to terminate him and terminated him anyway. (Doc. 16 at 24). This argument is supported by the complaint. Although the Plaintiff alleges therein that he "was finally afforded his procedural due process rights by the SBVA at the specially called meeting by Ivey

on October 22, 2024," he also explains that the Board voted not to terminate him and that the Defendant's subsequent termination of him "immediately following the SBVA's decision" was done in violation of his due process rights. (Doc. 1 at 18, ¶¶ 71–72).

As a preliminary matter, it must be noted that the failure to adhere to procedure imposed by state law does not necessarily constitute a violation of federal due process requirements. The Defendant argues that the procedural due process claim fails because it is partly based on a violation of state law and because she possessed authority under state law to terminate the Plaintiff. (Doc. 12 at 44–50). The Supreme Court has made clear that federal courts are not tasked with enforcing state procedural law; rather, a due process claim only survives if it alleges the deprivation of constitutionally mandated procedure, i.e. notice and a hearing. *See Loudermill*, 470 U.S. 532, 541 (1985); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 (11th Cir. 1987) ("[T]he violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes."). Thus, the Defendant is correct that, to the extent the Plaintiff's procedural due process claim is based on an allegation that Ala. Code § 31-5-6 was not followed, it fails. However, the claim is also based on a violation of federal due process, and whether the Defendant's conduct complied

with state law is inapposite to whether it violated federal due process principles. Therefore, the Defendant's purported authority under state law to terminate the Plaintiff does not defeat the claim.

The law governing the Plaintiff's procedural due process claim is as follows:

> An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis in original); see *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth,* 408 U.S., at 569–570, 92 S.Ct., at 2705; *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972).

*Loudermill*, 470 U.S. at 542.

In arguing that the termination was complete before notice or a hearing was provided, the Plaintiff heavily relies on the Defendant's statements in the letters that his service "must come to an end." (*See* docs. 1-1, 1-2, 1-3, 16 at 23–24). However, the Defendant's statements that the Plaintiff's service "must" end does not establish that the Plaintiff was actually terminated by the issuance of those letters. The Plaintiff does not allege that he stopped receiving pay, was removed from his

workplace, or that the nature of his employment changed in any way before the October 22 hearing.

The complaint and its attachments show that the Plaintiff was not terminated until October 22, 2024. There are two more letters attached to the complaint which were not referenced above. On October 10, 2024, the Defendant sent the Plaintiff a letter stating:

> Last month, you gave me your word that you would resign your post as Commissioner of Veterans Affairs effective December 31, 2024. After today's meeting of the State Board of Veterans Affairs, there is now a question whether you will in fact resign, as you promised me you would do.
>
> Please immediately reaffirm, in writing, your decision to resign.

(Doc. 1-3 at 42). On October 22, 2024, after the Board hearing, the Defendant sent the Plaintiff a letter stating, in pertinent part:

> Today, the State Board of Veterans Affairs failed to remove you immediately despite the ample legal causes I have publicly and repeatedly identified as justifying your removal. I therefore determine that your immediate removal is necessary to ensure that, going forward, the laws governing the Department of Veterans Affairs will be properly executed and enforced.
>
> By copy of this letter, you are hereby removed as Commissioner for the Department of Veterans Affairs, and, pursuant to the Board's vote at its October 10th meeting, Jeffrey L. Newton is now Interim Commissioner of Veterans Affairs. The relevant state officials, including Interim Commissioner Newton, are hereby directed to take the necessary steps to effectuate this removal.

(Doc. 1-4 at 1). The Plaintiff expressly "acknowledges that th[e October 18] letter d[id] provide [him] with notice of the charges and an opportunity to appear before the Board and to be heard." (Doc. 16 at 24). The complaint itself alleges that the Plaintiff "was finally afforded his procedural due process rights by the SBVA at the special called meeting by Ivey on October 22, 2024." (Doc. 1 at 18, ¶ 71). Therefore, his procedural due process claim does not appear to be based on an allegation that he was terminated before the October 22 hearing.

The Plaintiff's claim, however, is that the due process he was afforded at the hearing was insufficient because the Defendant had already decided to terminate him or planned to do so regardless of the outcome of the hearing, and because his subsequent termination overrode the Board's decision not to terminate him. (*See* Doc. 1 at 10, ¶¶ 35–36; doc. 1 at 18, 71–72). The Eleventh Circuit has determined that a biased decisionmaker at a pre-termination hearing creates a deprivation of procedural due process, but that such a deprivation can be cured by a post-deprivation hearing at which the employee may present evidence of the bias. *See McKinney v. Pate*, 20 F.3d 1550, 1562–63 (11th Cir. 1994) ("A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process.") (abrogated on other grounds as recognized in *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1240 (11th Cir. 2025)).

> In *McKinney* [*v. Pate*, 20 F.3d 1550 (11th Cir. 1994)], the plaintiff argued that the three-day pretermination hearing he received was defective because the decision maker was biased against him. 20 F.3d at 1555, 1561. Our Court analyzed whether an unbiased decision maker was required at the pretermination hearing and held one was not. *Id.* at 1562 ("[I]n the case of an employment termination case, due process does not require the state to provide an impartial decisionmaker at the pre-termination hearing." (quotation marks omitted and alterations adopted)). For this reason, it was acceptable for the state to cure the biased-decision-maker problem through a later hearing where "the challenger has an opportunity to present his allegations and to demonstrate the alleged bias." *Id.* More generally, the en banc court reaffirmed that "a procedural due process violation is not complete unless and until the State fails to provide due process." *Id.* at 1557 (quotation marks omitted). Thus, a state "may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.*

*Galbreath v. Hale Cnty., Alabama Comm'n*, 754 F. App'x 820, 827 (11th Cir. 2018).

Here, even if the Defendant's termination of the Plaintiff constituted a procedural deprivation, it appears that the State of Alabama provided a sufficient process to remedy that deprivation. The Eleventh Circuit explained the following in *McKinney*:

> An allegation of bias may arise in either of two scenarios: in the first, the challenger learns of the decisionmaker's alleged bias prior to or during the proceeding; in the second, the challenger learns of the decisionmaker's alleged bias only after the proceeding has terminated. To address these mutually exclusive scenarios, courts provide distinct procedures that afford the challenger an opportunity to address the alleged bias as well as to remedy outcomes that are tainted by bias.
>
> In the first scenario, that of the contemporaneously recognized bias, courts usually require that the challenger contemporaneously

object to the bias. Thus, when faced with a supposedly biased venireperson in a criminal case, for instance, the defendant must object to the biased individual during *voir dire*, either by a challenge for cause or by a peremptory strike; if the defendant fails to object to the biased individual at this preliminary stage, the objection is deemed waived. Similarly, a challenger must object to a biased judge in a motion to recuse before trial or as soon as the alleged bias is discovered; again, the penalty for failing timely to object is waiver of the objection.

In the second scenario, the alleged bias is discovered after the proceeding has concluded; a contemporaneous objection therefore is impossible. Due process requires that the challenger have an opportunity to object to the alleged bias, and courts consequently have instituted procedures to address allegations of bias and to set aside bias-tainted outcomes. Typically, courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case. *See Lockett v. Blackburn,* 571 F.2d 309, 314 (5th Cir.) (holding, in habeas corpus case filed by state prisoner, that deliberate concealment of named eyewitness by prosecution constitutes prima facie deprivation of due process), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1978); *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Absent a demonstration of prejudice, the challenger's allegations are discounted.

. . .

In both situations, due process is satisfied when the challenger has an opportunity to present his allegations and to demonstrate the alleged bias. A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process. As we mention above, unlike substantive due process violations, procedural due process violations do not become complete "unless and until the state refuses to provide due process." *Zinermon,* 494 U.S. at 123, 110 S.Ct. at 983. More specifically, in the case of an employment termination case, "due process [does not] require the state to provide an impartial decisionmaker at the pre-termination hearing. The state is obligated only to make available 'the means by which [the employee] can receive redress for the deprivations.'" *Schaper v. City of Huntsville,* 813 F.2d

709, 715–16 (5th Cir.1987) (quoting *Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981)) (footnote omitted).

. . . .

In *Parratt* (and its progeny, *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)), the Supreme Court held that due process did not require pre-deprivation hearings where the holding of such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or an intentional deprivation of property. All that due process requires, the Court said, is a post-deprivation "means of redress for property deprivations satisfy[ing] the requirements of procedural due process." *Parratt,* 451 U.S. at 537, 101 S.Ct. at 1914; *accord Hudson,* 468 U.S. at 533, 104 S.Ct. at 3204.

The precedent established by *Parratt* is unambiguous: even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation. As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, under *Parratt,* only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation. It is to an examination of this state remedy—and a determination of whether it satisfies due process—that we now turn.

. . .

In this case, McKinney failed to take advantage of any state remedies, opting instead to pursue his claim in federal court.[18] . . .

. . . .

. . . McKinney's state remedy is adequate. The Supreme Court held in *Parratt* that the state's remedial procedure need not provide all relief available under section 1983; as long as the remedy "could have fully compensated the [employee] for the property loss he suffered," *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917, the remedy satisfies procedural due process. The Florida courts possess the power to remedy McKinney's

> loss both in terms of damages and equitable relief; as such, the Florida procedures satisfy procedural due process and alleviate any deprivation McKinney may have suffered at the hands of the Board.
>
> We therefore conclude that McKinney's state remedy was capable of providing McKinney with all the relief warranted. Even if McKinney's bias allegations are true, the presence of a satisfactory state remedy mandates that we find that no procedural due process violation occurred.
>
> . . . .
>
> [18] Significantly, McKinney did not allege in his complaint that the state procedures were inadequate.

*McKinney v. Pate*, 20 F.3d 1550, 1562–63 (11th Cir. 1994) (en banc).

This case falls within the "second scenario" described in *McKinney*. The Defendant was the decisionmaker in this case because, even though the hearing was before the entire Board, the Defendant ultimately effectuated the termination. Based on the letters he received from the Defendant, the Plaintiff knew of the Defendant's bias in favor of his termination long before the October 22 hearing; however, he was not aware that the Defendant would be the decisionmaker until after the hearing, when the Defendant terminated him over the Board's decision.

Nevertheless, "due process [wa]s satisfied when the [Plaintiff] ha[d] an opportunity to present his allegations and to demonstrate the alleged bias." *Id.* at 1562. As in *McKinney*, the state provided the Plaintiff with an opportunity to present his allegations and demonstrate the Defendant's alleged bias. Two members of the Eleventh Circuit panel deciding *Horton v. Board of County Commissioners of*

*Flagler County*, 202 F.3d 1297, 1300 (11th Cir. 2000), construed *McKinney* as holding that "the process a state provides is not only that employed by the board, agency, or other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked."

Alabama courts have the power to review employment termination cases. Inherent in that power to review is the power to remedy deficiencies and to cure violations of due process. Therefore, the Alabama courts have authority to order the relief to which the Plaintiff claims to be entitled—a new hearing conducted by a fair tribunal. *See, e.g.*, *Robbins v. Cleburne Cnty. Comm'n*, 300 So. 3d 573, 575 (Ala. 2020); *Harper v. Winston Cnty.*, 892 So. 2d 346 (Ala. 2004); *Hicks v. Jackson Cnty. Comm'n*, 990 So. 2d 904, 910 (Ala. Civ. App. 2008). Moreover, the scope of the Alabama courts' review encompasses the claim the Plaintiff brought in federal court—that he was denied due process because of a partial decisionmaker: On certiorari review, Alabama state courts are "responsible for reviewing the record to ensure that the fundamental rights of the parties, including the right to due process, [have] not been violated." *Evans v. City of Huntsville*, 580 So.2d 1323, 1325 (Ala. 1991). The Plaintiff therefore has an available, adequate remedy in the state system.

The Plaintiff's allegations that the final decisionmaker in this case (the Defendant) was biased are "not tantamount to a demonstration that there has been a denial of procedural due process." *McKinney*, 20 F.3d at 1562. It appears that he

has not suffered a violation of his procedural due process rights because the State of Alabama has not "refuse[d] to make available a means to remedy the deprivation." *Id.* at 1563. Likewise, even if the Defendant did not have authority to terminate the Plaintiff, and that somehow implicated procedural due process, the state provided a remedy for that deprivation through its courts. The Plaintiff does not allege that the remedies available in state court were insufficient.[7] The Alabama courts' review more than satisfies *Parratt*'s post-termination process requirement. *See, e.g.*, *Hicks v. Jackson Cnty. Comm'n*, 374 F. Supp. 2d 1084, 1090 (N.D. Ala. 2005) ("[T]he state of Alabama has provided plaintiff with a post-deprivation remedy to redress [the County Commission's] decision to terminate his employment.").

As stated above, however, the court will not dismiss the claim on this basis without first providing the Plaintiff with an opportunity to respond, since this issue was not raised in the Defendant's motion to dismiss.[8]

---

[7] It is important to note that the *McKinney* rule does not mandate exhaustion of available state remedies. In other words, the *McKinney* analysis

> does not turn on whether a plaintiff has presented the claim to the state courts, because the rule is not based on ripeness or exhaustion principles. *See McKinney,* 20 F.3d at 1564 n. 20 ("McKinney's case fails, therefore, not for want of exhaustion; indeed, exhaustion is irrelevant to our decision and finds no mention in the opinion.")

*Horton*, 202 F.3d at 1300.

[8] Because there is an open question as to whether Count II states a claim based on an issue raised by the court *sua sponte*, the court will not address the Defendant's qualified immunity defense with respect to this claim until it enters an order on the merits of that claim, after receipt of the Plaintiff's brief, should the claim be found to have merit. The Defendant need not re-assert its qualified immunity argument.

## IV. Count III: "Declaratory Judgment and Request for Permanent Injunction"

Count III cannot proceed as a standalone cause of action. *See Burke v. Johnson*, 2016 WL 9503732, at *3 (M.D. Fla. 2016); *see also* 28 U.S.C. § 2201 (titled "Creation of remedy"). The Plaintiff must tether the remedies requested under Count III to a viable claim. Count III is due to be dismissed. To the extent the Plaintiff seeks equitable relief based on Count I, that request is due to be denied in light of the dismissal of that claim. To the extent the Plaintiff seeks equitable relief based on Count II, the procedural due process claim, the court will reevaluate the merits of that request upon receipt and review of the Plaintiff's supplemental brief.

## V. State-Law Claims

If Count II, like Count I, is due to be dismissed, the court will decline to exercise supplemental jurisdiction over the state-law claims. *See Baggett v. First Nat'l Bank,* 117 F.3d 1342, 1353 (11th Cir. 1997). Therefore, at this time, the court will refrain from addressing the state-law claims until it reviews the merits of Count II in light of the Plaintiff's supplemental brief.

Based on the foregoing, it is **ORDERED** as follows:

1. The Plaintiff shall **SHOW CAUSE** on or before September 17, 2026, as to why Count II should not be dismissed with prejudice for failure to state a claim based on the court's analysis above as to the available post-deprivation remedies.

2. The court will enter a final order on the Defendant's motion to dismiss (doc. 12) after receipt of the Plaintiff's brief concerning the procedural due process claim.

**DONE** and **ORDERED** on this the 10th day of September, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE